333 So.2d 264 (1976)
Fred P. WESTENBERGER
v.
STATE of Louisiana, Through the DEPARTMENT OF EDUCATION, et al.
No. 10717.
Court of Appeal of Louisiana, First Circuit.
May 24, 1976.
*266 Wm. J. Guste, Atty. Gen., and Willie D. Maynor, Asst. Atty. Gen., Baton Rouge, for State through Dept. of Ed.
Fred P. Westenberger, pro se.
Before LANDRY, COVINGTON and PONDER, JJ.
LANDRY, Judge.
The State of Louisiana, Through the Department of Education (Department) appeals from judgment awarding plaintiff Fred P. Westenberger (Assignee) the sum of $17,168.81 not received by Assignee from Louisiana Polytechnic Institute (Tech.), Nicholls State University (Nicholls) and, McNeese State University (McNeese) (Debtors), because of Debtors' failure to remit funds to Assignee pursuant to valid assignments. Assignee has also appealed seeking an additional $8,133.97 denied by the trial court on the grounds of equitable estoppel. We affirm in part and reverse in part.
For some years prior to 1970, Sackett Studios, Inc. (Studios) operated three photographic studios in the City of New Orleans, including corporate headquarters located at 1102 Canal Street. H. H. Sackett (Sackett) was Studios' president and principal shareholder. Sackett's wife, Rochelle Sackett, was Studios' secretary-treasurer. Sometime in the late 1960s, Studios branched out into the production of Student Identification Cards for universities, which endeavor required large expenditures in advance for special film in considerable quantities. The ID card business also necessitated the use of expensive, highly specialized equipment.
Assignee, an attorney-at-law, represented Studios and Sackett, commencing in the mid to late 1960s. When Sackett decided to venture into ID card production, Assignee and Sackett entered into an arrangement whereby Assignee would provide the funds required for Studios' purchase of ID card materials and acquire for lease to Studios such special equipment as was needed for the performance of Studios' ID card contracts.
Prior to July 1, 1970, Studios had obtained ID card contracts with several universities in different states. Included in these contracts were agreements with Debtors, which contracts commenced the fiscal year beginning July 1, 1970 and were renewable on an annual basis for the fiscal years commencing July 1, 1971 and July 1, 1972. Sackett also owned another concern named Alumina Perpetua, in whose name some of his pre-1970 ID card contracts had been negotiated, the remainder having been put in the name of Studios. When Assignee agreed to finance Sackett's ID card venture, another corporation, Securicard Systems, Inc. (SS Inc.) was formed in early 1970, with Sackett as its president and Assignee as its vice-president. It was understood that all future ID card contracts would be taken in the name of SS Inc. In addition to being SS Inc.'s vice-president, Assignee was listed as a shareholder of the corporation and was also authorized to counter sign all SS Inc. checks.
For the approximate period July 1, 1970 to June 30, 1973, Assignee arranged loans aggregating $30,000 to $40,000 annually, the proceeds of which were made available to SS Inc. and Studios to finance the ID card contracts undertaken by those corporations during that interval. The loans were made principally in the fall of each year at which time the universities enrollments were heaviest and thus required considerable ID card materials and extra personnel to handle the volume of work involved. In addition to furnishing Sackett working capital, Assignee purchased in his own name and leased to SS Inc. and Studios the special equipment required for ID card production. Assignee took no part in the operation of either SS Inc. or Studios other than to counter sign all checks issued by SS Inc. Assignee's sole remuneration *267 consisted of interest on the loans advanced and the rental agreed for the leased equipment. During the period in question Sackett continued to operate his regular photographic studios, but he did not maintain a separate accounting record of the ID card aspect of his operations.
After the incorporation of SS Inc., all new contracts obtained by Sackett for ID card production were taken in the name of SS Inc. However, for some time after 1970, the annually renewable ID card contracts held by Studios were renewed in Studios' name.
The record establishes by an overwhelming preponderance, that there was no agreement between Sackett and Assignee to share the profits of either Studios or SS Inc. It also appears that while Assignee was listed as a SS Inc. shareholder, no stock was ever issued Assignee.
As further security for the loans made to Studios and SS Inc., Assignee obtained from Studios an assignment of all proceeds due said concern for contracts to perform ID card work. Notice of said assignment, dated August 10, 1970, was received by Debtors, with the following instructions:
"Please forward all sums paid, or to be paid, under your contract with Sackett Studios, following receipt of invoice from them, to the following:
 Fred Westenberger
 Leasing
 1047 N.B.C. Bldg.
 New Orleans, LA. 70112"
In 1972, when certain contracts to produce ID cards were taken in the name of SS Inc., a second assignment was taken by Assignee, notice of which, dated July 26, 1972, was sent to and received by Debtors, with these instructions:
"Enclosed please find an assignment form executed by Securicard Systems, Inc. Kindly send proceeds to the office of
 F. P. Westenberger
 1047 N.B.C. Bldg.
 New Orleans, La. 70112"
It is conceded that during the period July 1, 1970 to June 30, 1973, Debtors, with whom Studios and/or SS Inc. had contracts to make student ID cards, issued numerous checks in payment for said services, which checks were made payable to and mailed to Studios at its main office at 1102 Canal Street, in violation of the directives contained in the above mentioned assignments. Assignee contends that a number of these checks were never received by him or SS Inc. but were instead misappropriated by Sackett. Assignee's suit is for the aggregate of the checks shown by their endorsements to have been received by someone other than Assignee or SS Inc.
The following salient facts are stipulated or conceded: (1) Debtors received the notices of assignment on or about August 12, 1970 and July 28, 1972; (2) All checks sued upon by Assignee were issued by Debtors in payment of goods and services rendered by Studios or SS Inc.; (3) All checks sued upon herein were made payable to persons other than Assignee and were deposited to accounts other than Assignee's account; (4) The assignments relied upon by Assignee are valid, complete assignments; and (5) that Assignee was never a stockholder, officer or director of concerns known or designated as H. H. Sackett or Hyman H. Sackett Travel Account, which names appear as endorser on some of the checks issued by Debtors, and to whose account the checks were deposited, all of which such checks are herein sued upon by Assignee.
Betty Lou Mixon, McNeese Comptroller since July 1, 1972, Gus Vavaro, Vice-President of Student Affairs at Nicholls and Weldon R. Walker, Purchasing Agent at Tech, testified as to the procedures employed by Debtors in payment of contracts for goods and services furnished those institutions. In essence, each admitted having made several payments in noncompliance *268 with the notices of assignment. Each, in effect, explained that the notices had been overlooked or misplaced in their files or that they merely assumed payments made to Sackett would be forwarded by him to the person entitled thereto.
Mrs. Mixon conceded that the August 10, 1970 notice of assignment was in her office files when she became comptroller but that she did not personally become aware of its existence until 1973, when she received correspondence from Assignee. After Mrs. Mixon became comptroller, all checks issued by McNeese were mailed pursuant to the second notice dated July 26, 1972, which payments are not involved herein. However, between September 25, 1970 and December 16, 1971, before Mrs. Mixon became comptroller, McNeese issued eleven checks which were mailed to Assignor's main office at 1102 Canal Street, admittedly in noncompliance with the August 10, 1970 notice of assignment. The first such check, dated September 25, 1970, was endorsed by Sackett and deposited to Assignee's account and is not sued upon. Another check, dated September 10, 1971, bears at undecipherable endorsement for which reason it also is not sued upon. The remaining nine checks, issued between September 30, 1970 and December 16, 1971, totalling $3,016.82 bear endorsements indicating they were neither received by Assignee nor deposited to Assignee's account. Assignee seeks recovery for the amount of these checks.
Mr. Vavaro testified that both notices of assignment were in his files. His general practice was to pay for ID card work by check manually delivered to representatives of studios and SS Inc., while such persons were still on campus. Vavaro explained that he had not obtained Assignee's permission to make payment in this manner but assumed that Assignor's representatives would forward the payments to the proper person. He also stated that some payments were made by mail, especially the cost of makeup pictures; checks in each such instance were sent to the invoice address. He could not recall whether or not the addresses on the invoices involved were the same in all instances.
Between the first notice date of August 10, 1970, and January 21, 1972, Nicholls issued eight checks for ID card work done by Assignor corporations. The first five checks, totalling $7,469.07 were payable to Studios and either manually delivered to Sackett employees on campus or mailed to 1102 Canal Street, New Orleans. All were endorsed by Studios. Assignee sues on these checks because none were received by him or deposited to his account. Nicholls' check dated August 28, 1971 for $5,869.25 was also payable to Studios and delivered to a Sackett employee on campus. This check was delivered to and received by Assignee and forms no part of Assignee's demand. In January of 1971, Nicholls issued SS Inc. a check for $174.86 and Sackett personally a check for $1,226.50, both admittedly either delivered on campus or mailed to 1102 Canal Street, New Orleans. The former is endorsed for deposit only in a "S.S.I. Account," which is not the account of either Studios or SS Inc.; the latter was endorsed by Sackett for deposit in his personal account. Assignee seeks recovery of both items.
Following receipt of the July 26, 1972 notice, Nicholls issued five checks to SS Inc. At least two checks were paid on campus, the testimony being unclear as to the manner of payment of the remaining three. The second paid on campus check, dated January 12, 1973, for $1,138.36, was the only one not received by Assignee, and its recovery is sought.
According to Weldon R. Walker, purchasing officer for Tech, his office issued purchase orders for all goods purchased by, as well as all services rendered to, that university. Based on such purchase orders, Tech's comptroller issued checks to the various suppliers and contractors. He acknowledged that the first notice of assignment *269 was misplaced in the files and that no Tech checks were transmitted in compliance therewith. Moreover, he did not consider the initial assignment applicable to Tech payments between July 1, 1971 and June 30, 1972, when Tech's contract was with SS Inc., because the first assignment was from Studios, not SS Inc. Walker also stated that all Tech checks issued after July 26, 1972, the effective date of the SS Inc. assignment, and June 30, 1973 were mailed in compliance with the assignment. It is shown, however, that at least one Tech check issued after July 26, 1972 was received and endorsed for deposit in an account designated "S.S.I. Account" which account was under Sackett's personal control.
From September 20, 1970 to June 14, 1971, when Tech's contract was with Studios and the initial notice of assignment was admittedly applicable, Tech issued nine checks totalling $6,861.11 to Studios for student ID work, all of which checks were mailed to 1102 Canal Street, New Orleans, in admitted noncompliance with the August 1970 assignment. All were endorsed for deposit only in Studios' account.
During the fiscal year July 1, 1971 through June 30, 1972, when Tech's contract was with SS Inc., and the 1970 assignment was allegedly inapplicable, Tech issued six checks to SS Inc., all of which were mailed to 1102 Canal Street, New Orleans. Assignee is suing on only two of these checks because three of the remaining four were received by Assignee and the endorsement on the fourth such check is so illegible that the true disposition of its proceeds cannot be ascertained. Of the two checks sued upon, one, dated September 20, 1971 for $4,462.29, was endorsed by Sackett and deposited to his travel account. The other, dated April 17, 1972 for $274.75, was endorsed "for deposit only" in the account of a concern known as S.S.I.
After receipt of the 1972 notice of assignment from SS Inc. to Assignee, Tech issued five checks to SS Inc. for ID work, all of which, Walker testified, were sent to Assignee in compliance with the assignment. However, one such check was not received by Assignee but was endorsed for deposit only in the account of S.S.I., which account was apparently under Sackett's exclusive control. This check, dated November 1, 1972, for $405.32, is among those sued upon herein.
The trial court found that none of the checks sued upon were delivered or mailed to Assignee and that Assignee had no knowledge of the issuance of said checks until 1973, when Assignee discovered that Sackett was misappropriating funds due Assignee. The trial court also found that none of the checks in suit were received by Assignee or SS Inc., in which corporation assignee was an officer and alleged stockholder. The trial court also rejected the Department's contention that Assignee negligently failed to require more satisfactory security for his loan and in failing to demand a more effecient accounting from Sackett.
Based on Walker's testimony, the trial court found neither assignment applicable to Tech's checks issued between July 1, 1971 and June 30, 1972, under the SS Inc. contract and that Assignee was not entitled to recover for the two checks, totalling $4,737.04, issued during that interval and not received by Assignee. However, the lower court found this determination inapplicable to Nicholls and McNeese because their contracts for this same period were merely renewals of the original Studios contract. For this reason the court concluded that no new assignment was necessary as to Nicholls and McNeese.
The trial court also denied Assignee's recovery on several checks upon finding Assignee estopped, which estoppel was applied to checks issued after Assignee had knowledge that Debtors were in noncompliance with the assignments. Assignee's recovery was limited to $17,168.81, representing checks issued before Assignee became aware of Debtors' noncompliance.
*270 The Department has appealed contending the trial court erred as follows: (1) overruling the Department's exception of three years prescription; (2) finding that none of the checks aggregating the $17,168.81 recovery allowed Assignee were received either by Assignee or SS Inc.; (3) failing to find that Assignee and Sackett were joint ventures and that Sackett's misconduct was therefore imputable to Assignee; (4) failing to find that Assignee had earlier notice of Debtors' noncompliance than that found; and (5) failing to find Assignee negligent for failure to require greater security and safer accounting methods on the part of Studios and Sackett.
Assignee has appealed contending that the trial court erred in applying equitable estoppel by silence to Assignee's claim and thus denying recovery on certain checks and also in inadvertently omitting three checks, totalling $1,250.07, from the judgment awarded.

PRECRIPTION
The Department's plea of three years prescription applicable to accounts of merchants or other accounts, provided for by La.Civ.Code Art. 3538, was properly held inapplicable herein by the trial court. The cited article applies only to accounts for goods sold, merchants' accounts against their customers and to those businesses or other relations in which accounts are customarily rendered. United Carbon Company v. Mississippi River Fuel Corp., 230 La. 709, 89 So.2d 209. Article 3538 does not apply to claims for labor and materials furnished at various times extending over a period of several months, such claims being characterized as personal actions which are governed by the ten year prescriptive period provided by La.Civ.Code Art. 3544. Antoine v. Franichevich, 184 La. 612, 167 So. 98.
In this instance Sackett and his employees furnished labor and materials more in the nature of contractors rather than merchants. The prescriptive period for a personal contract to furnish goods and services is that of ten years pursuant to Article 3544. An assignee is governed by the same prescriptive rules applicable to his assignor. Carte Blanche Corporation v. Pappas, La.App., 216 So.2d 917.

ASSIGNEE'S NON-RECEIPT OF CHECKS AT ISSUE
The Department does not make clear the basis of its contention that the trial court erroneously concluded that none of the checks sued upon were received by Assignee directly or through a corporation in which Assignee had an interest. The Department merely suggests that several of said checks were payable to and endorsed by SS Inc., a corporation in which Assignee was a shareholder. However, the endorsements on eleven checks payable to SS Inc. show conclusively that their proceeds were never received by Assignee or SS Inc. Four were deposited to the account of Studios; five were endorsed for deposit only in the account of S.S.I.: one was deposited to H. H. Sackett Travel Account and the remaining check was deposited in an account unknown to Assignee. We find that the record supports the conclusion that none of these checks were received by Assignee or any corporation in which Assignee had an interest.

ALLEGED JOINT VENTURE
A joint venture is a special combination of two or more persons who engage in a specific venture for their joint profit or gain, without an actual partnership or corporate designation. Hayes v. Muller, 245 La. 356, 158 So.2d 191. It has been expressly held that a joint venture cannot exist where the business or enterprise is organized and operated in corporate form. Ault & Wiborg Co. of Canada, Ltd. v. Carson Carbon Co., 181 La. 681, 160 So. 298. Moreover, to constitute a *271 joint venture, each party must have equal right to direct and govern the conduct of the other involved, as well as some voice in the control and management of the business undertaking which is the subject of the parties' relationship. Hauth v. Iacoponelli, 251 La. 410, 204 So.2d 767.
The elements necessary for a joint venture are lacking herein. Assignee and Sackett were officers and presumably shareholders in a common corporation, SS Inc. Assignee's only other relationship with the enterprise in question was that of creditor of SS Inc., lessor of SS Inc. and Studios, and also as attorney for both corporations. There was no agreement between Assignee and Sackett to share the profits of the ID card venture; neither did Assignee exercise any control or management over the undertaking. It follows that there was no joint venture agreement between Assignee and Sackett.

EQUITABLE ESTOPPEL
The trial court found that Assignee had actual knowledge of noncompliance with the assignment notices by McNeese on December 4, 1970, by Nicholls on August 28, 1971, and by Tech on October 20, 1971. This conclusion was predicated upon Assignee's endorsement of checks sent by Debtors respectively on the mentioned dates, which checks had been either manually delivered to Sackett or one of his employees or mailed to 1102 Canal Street. The lower court held that Assignee thereby incurred the obligation of re-notifying Debtors when these violations of instructions occurred and that Assignee's failure in this respect barred and estopped Assignee's recovery for checks issued thereafter.
Estoppel is not favored in law because it bars the normal assertion of rights, for which reason the doctrine is cautiously applied. Estoppel must be specifically pleaded; each element required for estoppel must be proven by the pleader. American Bank and Trust Company v. Trinity Universal Insurance Company, 251 La. 445, 205 So.2d 35. Additionally, the pleader of estoppel must establish his own good faith and diligence. United Gas Pipeline Company v. Bellard, La.App., 286 So.2d 109.
Equitable estoppel is the effect of the voluntary conduct of a party which precludes his asserting rights against another who has justifiably relied upon such conduct and changed his position so that he will sustain injury if the former is allowed to repudiate his conduct. Based on good faith, the doctrine prevents injustice by barring a litigant, under special circumstances, from taking a position contrary to his prior acts, admissions, representations, or silence. American Bank and Trust Company v. Trinity Universal Insurance Company, above.
The three elements required for application of equitable estoppel are: (1) a representation by conduct or work; (2) justifiable reliance thereon; and (3) a change of position to one's detriment because of the reliance. Wilkinson v. Wilkinson, La., 323 So.2d 120.
In this case, the Department invokes estoppel by silence contending that Debtors justifiably relied on Assignee's failure to protest transmissions of payments in noncompliance with the assignment agreements. The jurisprudence is well settled to the effect that mere inaction or silence cannot be the foundation of estoppel unless the circumstances impose a duty to speak or act, and for this duty to arise, the following conditions must be met: (1) the party estopped must be shown to have had opportunity to speak or act; (2) the party estopped must have had full knowledge of the facts and of his rights; (3) the party estopped must have intended to mislead or at least have had a willingness that others should be deceived; (4) the pleader of estoppel must be shown to have been ignorant of the truth and without convenient or ready means of learning *272 the truth; and (5) the pleader of estoppel must have been misled into doing what he would not have done but for the silence of the party estopped. Harvey v. Richard, 200 La. 97, 7 So.2d 674; Parker v. Ohio Oil Co., 191 La. 896, 186 So. 604; Hattiesburg Manufacturing Co. v. Pepe, La.App., 140 So.2d 449.
The record discloses that Assignee knew only that Debtors occasionally transmitted payments to unauthorized persons but had no knowledge of Sackett's misappropriations. On the contrary, Assignee received occasional checks transmitted through Sackett which could have induced the reasonable assumption that Sackett was properly accounting to Assignee for all such payments. Moreover, the record is totally devoid of any intent upon Assignee's part to deceive or mislead Debtors. We find these circumstances sufficient to preclude application of equitable estoppel in this instance.
We agree with the trial court's determination that Assignee should not be barred from recovery because of alleged negligence in failing to require greater security for his loan. This contention addresses itself simply to a matter of business judgment.
In effect, however, the trial court applied the doctrine of estoppel by silence predicated almost entirely upon Whittington Co. v. Louisiana Paper Co., Ltd., 224 La. 357, 69 So.2d 372, in which plaintiff lessor sued defendant lessee for monthly rental payments misappropriated by lessor's employee to whom lessee made payments, contrary to the lease which provided for deposit of monthly rental to lessor's bank account. In Whittington, lessor was barred from recovery because the accountant involved was considered lessor's general agent who had great latitude in managing lessor's affairs.
Assignee herein had assignments from Sackett for student ID work from numerous universities other than Debtors. Assignee had no way of knowing the dates that payments would be made on Sackett's contracts or the amounts thereof. We find Whittington, above, so factually dissimilar as to be inapplicable herein.

CHECKS NOT COVERED BY THE ASSIGNMENTS
The first such check issued by Tech was dated July 28, 1970, before the effective date of the August 10, 1970 assignment. Assignee's concession that this check was erroneously included in those sued upon precludes further discussion of this item.
We are in agreement with the trial court's determination that the 1970 notice of assignment did not apply to checks issued by Tech after June 30, 1971, because the notice referred exclusively to an assignment by Studios. However, on July 1, 1971, Tech confected a new contract with SS Inc., which agreement was not a renewal but rather a new contract awarded after competitive bidding. Since Tech had no notice of an assignment by the new corporation, SS Inc., Tech was not obligated to remit to Assignee payments made thereon. We therefore find that the trial court properly denied Assignee recovery for Tech's check No. 243, dated September 20, 1971, for $4,462.29, and check No. 5425, dated April 17, 1972 for $274.75.
We conclude that Assignee is entitled to recover on the following checks: McNesse checks numbered 011902, 015400, 016045, 018677, 019739, 020405, 021350, 024763 and 025468, totalling $3,016.82; Nicholls checks numbered 153, 174, 179, 195, 197, 212, 213 and 238, totalling $10,008.79; and Tech checks numbered 16972, 17042, 17420, 18674, 19093, 19890, 21421, 22224, 23276 and 9780, totalling $7,266.43, or an aggregate amount of $20,292.04.
It is ordered, adjudged and decreed that the judgment of the trial court in favor of plaintiff Fred P. Westenberger against defendants the Department and Debtors be *273 and the same is hereby amended to increase the award to said plaintiff from $17,168.81 to $20,292.04, with legal interest thereon from date of judicial demand, until paid. All costs of these proceedings to be borne by defendants, the Department and Debtors, to the extent permitted by law.
Amended and rendered.