**Hartland Dean WEST**

v.

**KERR–McGEE CORPORATION, et al.**

**Civ. A. No. 82–97.**

United States District Court,
E.D. Louisiana.

March 8, 1983.

Carl J. Hebert, Courtenay, Forstall, Grace & Hebert, New Orleans, La., for plaintiff.

Ethel H. Cohen, Deutsch, Kerrigan & Stiles, New Orleans, La., for defendants.

## OPINION

MENTZ, District Judge.

The matter now before the Court in this case is a motion for summary judgment submitted by the defendant, Kerr-McGee Corporation ("Kerr-McGee"), against the plaintiff, Hartland Dean West ("West"). Kerr-McGee argues that West was its "borrowed employee" and thus that his exclusive remedy is for compensation under the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901–50. West contends that he is not limited to recovery under the LHWCA for two reasons: first, because he was not a borrowed employee of Kerr-McGee; and, second, because the Louisiana Ruin Statute provides him with an independent basis for recovery in tort. *See* La.C.C. art. 2322.

Argument on Kerr-McGee's motion was originally heard on September 22, 1982. At that time, the Court, even though inclined to grant the motion, agreed to give West an additional ninety days to take more depositions. Further argument was heard on January 26, 1983. After listening to counsel for both parties, the Court took the matter under submission.

A brief review of the facts may prove helpful in understanding the dispute here. In August of 1980, West completed an application to work for Kerr-McGee. Mr. Ronald Ratcliff, a Kerr-McGee employee, explained to West that, while Kerr-McGee was interested in his services, the company was only willing to provide him with work as a contract employee. Shortly thereafter, Ratcliff arranged an interview for West with Berry Brothers General Contractors ("Berry Brothers.") As a result of the interview, Berry Brothers hired West and sent him to work as a contract pumper on Kerr-McGee Platform 229–A, located approximately eighty miles off the coast of Louisiana.[1] In January of 1981, roughly

---

**1.** As the Fifth Circuit pointed out in *Gaudet v. Exxon Corp.,* 562 F.2d 351, 354, n. 3 (5th Cir. 1977):

> The Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq., the jurisdictional base for these suits, specifically makes applicable the provisions of the Longshoremen's and Harbor Workers' Compensation Act for compensation for injuries sustained by employees engaged in the work of producing oil or gas or other natural resources from subsoil or seabed of the outer continental shelf. § 1333(c).

five months after he was hired, West was injured on the platform when a Kerr-McGee employee allegedly caused an explosion by lighting a cigarette.

The Court here is aware that, in reviewing a motion for summary judgment, it must examine the entire record and draw all reasonable inferences in favor of the party opposing the motion, which in this case is West. *AT & T v. Delta Communications Corp.,* 590 F.2d 100 (5th Cir.), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). The Court is also aware, however, that it should grant a motion for summary judgment unless the party opposing the motion introduces "significant probable evidence" demonstrating the existence of a triable issue of fact. *Ferguson v. National Broadcasting Co., Inc.,* 584 F.2d 111, 114 (5th Cir.1978). In this case, West has introduced no such evidence.

The guidelines for resolving the "borrowed employee" question have been discussed by the Fifth Circuit in numerous cases. *See, e.g., Hebron v. Union Oil Co. of California,* 634 F.2d 245 (5th Cir.1981); *Gaudet v. Exxon Corp.,* 562 F.2d 351 (5th Cir.1977); *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978); *Ruiz v. Shell Oil Co.,* 413 F.2d 310 (5th Cir.1969). These guidelines were first articulated by the Fifth Circuit in *Ruiz* at 312–13:

(1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

(2) Whose work is being performed?

(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4) Did the employee acquiesce in the new work situation?

(5) Did the original employer terminate his relationship with the employee?

(6) Who furnished tools and place for performance?

(7) Was the new employment over a considerable length of time?

(8) Who had the right to discharge the employee?

(9) Who had the obligation to pay the employee?

Although "no one factor or specific combination of factors is determinative of the borrowed employee relationship," *see Dugas v. Pelican Construction Co., Inc.,* 481 F.2d 773, 778 (5th Cir.1973), the Fifth Circuit held in *Ruiz* that "the factor of control is perhaps the most universally accepted standard for establishing an employer-employee relationship." *Ruiz,* 413 F.2d at 312. More recently, in *Hebron,* the Fifth Circuit stated that "the central question in borrowed servant cases is whether someone has the power to control and direct another person in his work." *Hebron,* 634 F.2d at 247. The Court in *Hebron* explained the meaning of "control" in this context by discussing the rule in light of the relevant facts in the case. Here is the Court's explanation:

In the present case, Union Oil had the power to direct and supervise Hebron. Although Union Oil could not discharge Hebron, it had the right to terminate his services with Union Oil. Hebron lived on and ate at Union Oil facilities and was taking orders from a Union Oil employee at the time of the accident. Under the holding in *Gaudet,* we find that the district court was correct in directing a verdict for Union Oil on the ground that Hebron was a borrowed servant.

*Id.* at 247.

Kerr-McGee's power to control West's activities in this case is indistinguishable, in all relevant respects, from Union Oil's power to control Hebron's activities in *Hebron.* The deposition testimony supports this conclusion unequivocally. Ratcliff maintains, for example, that Kerr-McGee had the power to control West's activities. (Ratcliff, Dep. p. 14). C.A. Gray, a Berry Brothers roustabout foreman, and Cletus Gibbons, a senior switcher for Kerr-McGee, say the same. (Gray Dep. p. 11; Gibbons Dep. p. 39). Danley C. Romero, the Kerr-McGee shift foreman in charge of Platform 229–A at the time of West's injury, states that he was West's supervisor. (Romero Dep. pp. 14, 53). Nowhere in the

record, in fact, is there any indication that Berry Brothers had the power to control West's activities on the platform.

West rightly contends that, at the time of his accident, no supervisor was on Platform 229–A. From this, he concludes that he was under no one's control when he was injured. *Ruiz* and *Hebron,* however, do not speak of control per se. They speak, rather, of the "power to control;" or, what amounts to the same thing, the "right to control." Thus, the fact that no Kerr-McGee supervisor was actually exercising control over West's activities at the time the accident occurred is irrelevant. The critical question is who had the power or the right to control West's activities at that time. The answer, as the deposition testimony indicates, is Kerr-McGee.[2]

■ West also advances two other contentions to support his claim that he was not a borrowed servant of Kerr-McGee. The first is that Kerr-McGee had no right to discharge him. This is only partially true, however. For although Kerr-McGee had no right to discharge West as an employee of Berry Brothers, it did have a right to terminate his services with Kerr-McGee. In *Hebron,* the court found that Union Oil had a similar right to terminate Hebron's services. *Hebron,* 634 F.2d at 247. The court there viewed possession of this right as being sufficient to satisfy Guideline 8 in *Ruiz.* Since West has failed to distinguish Kerr-McGee's right from Union Oil's, his first additional contention must be rejected.

■ West's second additional contention, which focuses on Guideline 3 in *Ruiz,* is more compelling. Even so, it too must be rejected. The contention is that the Master Service Contract between Kerr-McGee and Berry Brothers that was in effect when West was injured barred Kerr-McGee from making West its borrowed employee. The relevant part of that contract reads:

Contractor [Berry Brothers] is an independent contractor, free of control and supervision by Kerr-McGee as to the means or manner of performing all work or services hereunder, Kerr-McGee having contracted here and solely for the result of such work or services. Neither contractor nor any person used or employed by contractor shall be deemed for any purpose to be the employee, agent, servant or representative of Kerr-McGee in performance of any work or services, or any part thereof under this agreement. The actual performance and supervision of all work or services performed hereunder shall be by contractor; provided, however, Kerr-McGee and its authorized representatives shall have, at all times, the general right of inspection of the same.

What West overlooks in advancing this contention is that both he and Berry Brothers acquiesced in Kerr-McGee's use of him as a borrowed employee and that this acquiescence was sufficient to satisfy Guideline 3. *Ruiz,* 413 F.2d at 313. *See also Standard Oil v. Anderson,* 212 U.S. 215, 220, 29 S.Ct. 252, 253, 53 L.Ed. 480 (1909). Given this, together with the inadequacies of his other contentions, West has failed to raise a triable issue of fact regarding his employee status. That West was Kerr-McGee's borrowed employee is an issue about which there can be no genuine dispute.

■ There can also be no genuine dispute about the relevance of the Louisiana Ruin Statute to this case. That statute provides: "The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction." La.C.C. art. 2322. In relation to West's claims, the Ruin Statute is irrelevant. As the Fifth Circuit noted in

---

2. Since rights and duties in this context are correlative, *see* Corbin, "Legal Analysis and Terminology," 29 Yale L.J. 163 (1919), Kerr-McGee had a right to control West's activities on Platform 229–A if West had a duty to follow the instructions issued to him by his Kerr-McGee supervisors. That West had such a duty is undisputed. That his supervisors rarely issued him instructions, because the nature of his job was relatively simple, is beside the point. For at all relevant times West was obligated to perform his duties aboard the platform in precisely the way his superiors had taught him to perform them.

*Gaudet:* "The LHWCA was designed to provide an injured employee with certain and absolute benefits in lieu of possible common law benefits obtainable only in tort actions against his employer." 562 F.2d at 356. *See also Haynes v. Rederi A/S ALADDIN,* 362 F.2d 345 (5th Cir.1966), *cert. denied,* 385 U.S. 1020, 87 S.Ct. 731, 17 L.Ed.2d 557 (1967). No other conclusion would appear to be consistent with the language of §§ 4 and 5 of the LHWCA. Section 5 provides, in pertinent part, that "The liability of an employer prescribed in section 904 of this title shall be *exclusive and in place of* another liability of such employer to the employee." 33 U.S.C. § 905 (emphasis added). See *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). Section 4 provides, in pertinent part, that "(a) Every employer shall be liable for and shall secure the payment to his employees of the compensation payable under sections 7, 8 and 9 [33 U.S.C. §§ 907–909] .... (b) Compensation shall be payable irrespective of fault as a cause for the injury." 33 U.S.C. § 904. If West has a remedy, then, it lies in compensation, not in tort.

In light of the foregoing, the Court hereby GRANTS Kerr-McGee's motion for summary judgment.