Hartland Dean WEST

v.

KERR–McGEE CORPORATION, et al.

Civ. A. No. 82–97.

United States District Court,
E.D. Louisiana.

April 27, 1984.

A. Gill Dyer, Courtenay, Forstall, Grace & Hebert, New Orleans, La., for plaintiff.

Robert B. Nolan, Adams & Reese, Timothy F. Burr, McGlinchey, Stafford, Mintz & Cellini, New Orleans, La., for defendants.

## MEMORANDUM OPINION

MENTZ, District Judge.

The plaintiff in this case was injured while working aboard a platform located in the Gulf of Mexico eighty miles off the Louisiana coast. Four corporations owned the platform on which the accident occurred: Kerr-McGee Corporation ("Kerr-McGee"), Cabot Corporation ("Cabot"),[1] Felmont Oil Corporation ("Felmont"), and Case-Pomeroy Oil Corporation ("Case").[2] Kerr-McGee owned approximately 64% of the platform, Cabot owned approximately 16% of it, and Felmont and Case owned approximately 10% each. None of the minority-interest owners—neither Cabot nor Felmont nor Case—participated in the day-to-day operation of the platform. At all relevant times, the sole operator was Kerr-McGee.

This action began when the plaintiff sued Kerr-McGee in tort. Shortly thereafter, Kerr-McGee submitted a motion for summary judgment. After hearing argument on the motion, the Court took the matter under advisement. On March 8, 1983, the Court ruled that Kerr-McGee was the plaintiff's "borrowed employer" and was therefore immune from tort liability under § 905(a) of the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"). *West v. Kerr-McGee Corp.* 558 F.Supp. 669 (E.D.La.1983). This ruling, granting the motion, is now on appeal. Following the dismissal of Kerr-McGee, the plaintiff amended his complaint to name the three minority-interest owners as defendants and to request relief in tort against each of them. These new defendants have now submitted their own motion for summary judgment. That motion is the subject of this memorandum.

The minority-interest owners contend that, like Kerr-McGee, they too are immune from tort liability under § 905(a). In support of this contention, they characterize their relationship with Kerr-McGee as a joint venture and maintain that the plaintiff was a "borrowed employee" of the joint venture and not simply of Kerr-McGee. The plaintiff disagrees. He argues that Kerr-McGee, Felmont, Cabot, and Case were never more than co-owners of the platform and that, consequently, Felmont, Cabot, and Case are liable to him in solido under Louisiana Civil Code Articles 2315, 2317, and 2322.

The minority-interest owners bear a heavy burden here. Under Rule 56 of the Federal Rules of Civil Procedure, "summary judgment is appropriate only where everything in the record demonstrates the absence of any genuine issue of material fact." *Simon v. United States,* 711 F.2d 740, 745 (5th Cir.1983). Moreover, when a genuine dispute about a material fact allegedly exists, "the district court must view the evidence in the light most favorable to the party resisting the motion." *Id.* at 743. Still, the resisting party cannot create a genuine dispute about a material fact simply by alleging that such a dispute exists. *Nicholas Acoustics & Specialty Co. v. H & M Construction Co.,* 695 F.2d 839, 844 (5th Cir.1983). Once the moving party shows that it is entitled to summary judgment as a matter of law, the burden shifts to the resisting party to show that summary judgment is inappropriate. *Id.* To prevail, the resisting party must introduce "competent evidence setting forth specific facts to show that there is a genuine issue of material fact for trial." *White v. United Parcel Service,* 692 F.2d 1, 3 (5th Cir.1982). This the plaintiff has failed to do. The defendants have met their burden, but he has not met his.

Given the location of the plaintiff's accident in this case, our analysis of the sub-

---

1. Cabot Corporation is the successor by merger with Cabot Carbon Company.

2. Case-Pomeroy Oil Corporation is the successor in interest of Essex Royalty Corporation.

stantive law must begin with the Outer Continental Shelf Lands Act ("OCSLA"). 43 U.S.C. § 1331, et seq; *see also* 43 U.S.C. § 1301(a). That act "makes applicable the provisions of the [LHWCA] for compensation for injuries sustained by employees engaged in the work of producing oil or gas or other natural resources from subsoil or seabed of the outer continental shelf. 1333(c)." *Gaudet v. Exxon Corp.*, 562 F.2d 351, 354 n. 3 (5th Cir.1977). No dispute exists in this case regarding the applicability of the LHWCA. On this point, the Court and all counsel agree.

The relevant provision in the LHWCA is § 905(a). That provision provides, in pertinent part, that "[t]he liability of an employer [to pay the compensation] prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee." 33 U.S.C. § 905(a). In construing this language, courts have consistently held that a joint venture may be classified as an "employer" under § 905(a) and that, when such a classification is appropriate, each participant in the joint venture enjoys the protection of the exclusive remedy provision. *Bertrand v. Forest Corp.*, 441 F.2d 809, 811 (5th Cir.1971); *Haas v. 653 Leasing Co.*, 425 F.Supp. 1305, 1316 (E.D.Pa.1977). As these holdings make clear, the threshold issue before the Court is whether Kerr-McGee and the minority-interest owners were engaged in a joint venture.[3] This issue must be resolved according to the law of Louisiana. *Bertrand, supra; Haas, supra.*

█ Under Louisiana law, "joint ventures are likened to partnerships and are governed generally by the same rules." *Huffman Technical Drilling, Inc. v. Smith*, 424 So.2d 435, 438 (La.App.1982). Three of these rules can be found in *Marine Services, Inc. v. A-1 Industries*, 355 So.2d 625, 628 (La.App.1978):

> There are three major requirements for the existence of a joint venture or

partnership to be found. First, all the parties must consent to the formation of a partnership. C.C. Art. 2805. Second, there must be a sharing of the losses of the venture as well as the profits. C.C. Arts. 2811, 2813, 2814. And last, each party must have some proprietary interest in, and be allowed to exercise some right of control over, the business. *Westenberger v. State Dept. of Education*, 333 So.2d 264 (La.App. 1st Cir.1976); *Vignes-Bombet Co. Inc. v. Rowe*, 288 So.2d 889 (La.App. 1st Cir.1973); *Roberson v. Maris*, 266 So.2d 488 (La.App. 4th Cir.1972); *Hauth v. Iacoponelli*, 251 La. 410, 204 So.2d 767 (1967).

A fourth major requirement, not mentioned in *Marine Services* but important nonetheless, is that a joint venture must involve "an undertaking by two or more persons to combine their property, capital, labor or skill or any combination of these elements in the conduct of a particular line of trade or general business...." *Frazell v. United States*, 213 F.Supp. 457, 462 (W.D.La. 1963), *rev'd on other grounds*, 335 F.2d 487 (5th Cir.1964), *reh. denied*, 339 F.2d 885 (5th Cir.), *cert. denied*, 380 U.S. 961, 85 S.Ct. 1104, 14 L.Ed.2d 152 (1965); *see also Huffman Technical Drilling, supra*, at 438. In short, then, every joint venture will as a general rule satisfy the following four requirements: (1) intent, (2) loss and profit sharing, (3) control, and (4) an undertaking of trade or general business. *See generally* O'Neal, An Appraisal of the Louisiana Law of Partnership: Part I, 9 La.L. Rev. 307 (1949); Comment, The Business Joint Venture in Louisiana, 25 Tul.L.Rev. 382 (1951); Note, Formation and Nature of Partnership, 45 Tul.L.Rev. 331 (1971) ("Tulane Note"); Note, Categories of Partnership in Louisiana, 45 Tul.L.Rev. 352 (1971); Note, Partnership—Tests Used in Determining Its Existence, 35 Tul.L.Rev. 448 (1961); Note, Essential Elements of Louisiana Partnership, 21 Tul.L.Rev. 307 (1946). With these requirements in mind, the Court

---

**3.** Since this issue is resolved in favor of the minority-interest owners, the Court need not discuss whether Code Articles 2315, 2317, and 2322 apply to minority-interest owners who are not joint venturers.

will begin by describing the relationship between Kerr-McGee and the minority-interest owners. After doing so, the Court will then show how that relationship satisfies each of the four requirements of a joint venture.

On February 16, 1960, Kerr-McGee, Felmont, Cabot Carbon Company,[4] and Essex Royalty Corporation [5] entered into an agreement. Their aim in doing so was purportedly

> to create and implement a joint venture among all four parties ... for the purpose of [bidding on] and acquiring oil and gas leases from the U.S. Government, exploring those leases for oil and natural gas, producing and developing oil and gas from those leases and sharing all the costs and production of the venture in accordance with the respective ownership shares of the parties.

[*See* Affidavit of Daniel E. Chieco; *see also* Letter of Kerr-McGee Oil Industry, Inc. dated February 17, 1960; Agreement of parties dated February 16, 1960 ("1960 Agreement) ]. Immediately after entering into the agreement, the parties began to implement it. On February 24, 1960, they submitted joint bids for several leases covering land located on the outer continental shelf off the Louisiana coast. Shortly thereafter, the parties purchased four leases from the federal government. One of the four, OCS No. 0830, covered Ship Shoal Area Block 229. (*See* Operating Agreement Exhibit "A"). This is the block that contained the platform on which the plaintiff was injured.

The next important event occurred on March 1, 1961. On that day, pursuant to § 8 of the 1960 Agreement, Kerr-McGee and the defendants herein entered into an operating agreement "for the development and operation of [the four] leases and lands for oil and gas purposes." (*See* Operating Agreement, p. 1). This second agreement names Kerr-McGee as the "Operator of the jointly owned premises" and states that

Kerr-McGee "shall have the full control and management of the jointly owned premises, except as otherwise herein specifically provided[,] and shall conduct and direct all operations thereon." (*See id.* at §§ 1.1 and 1.2). Few limitations, however, were actually imposed by the agreement on Kerr-McGee's right to control and manage the premises. Here are two typical limitations: (1) Expenditures in excess of $5,000, unless made in connection with the drilling, reworking, deepening or plugging back of a well or because of an emergency, were to be prohibited;[6] and (2) all parties were to have access to the jointly owned premises to inspect both the operations and the file information relevant to them. (*See id.* at §§ 8.1 and 11.1). Numerous sections in the agreement show that costs and liabilities, including employee benefits and expenses, were to be shared by the four corporations on a pro rata basis. Section 2.1 is illustrative: "Unless changed by other provisions, all costs and liabilities incurred in operations under this Agreement shall be borne and paid, and all equipment and material acquired in operations on the jointly owned premises shall be owned, by the parties as their interests are set out in Exhibit 'A'." (*See id.* at §§ 2.1, 5.1, 9.3, 9.8 and 17.1; *see also* Accounting Procedure for Joint Operations, Exhibit "B"). Profits were to be shared in a similar manner. (*See id.* at §§ 2.1 and 10.1).

One additional fact needs to be mentioned. The last sentence in § 17.1 of the operating agreement reads: "It is not the intention of the parties to create, nor shall this Agreement be construed as creating[,] a mining or other partnership or association, or to render them liable as partners." The plaintiff argues that this sentence alone, when read in light of the first requirement in *Marine Services*, requires denial of the defendants' motion for summary judgment. The argument runs as follows: Louisiana law provides that individuals cannot form a joint venture without the intent

---

4. See footnote 1, *supra.*

5. See footnote 2, *supra.*

6. The amount was increased to $10,000 on May 19, 1972.

to do so. *Marine Services, supra,* at 628. Section 17.1 reveals that the parties to the operating agreement lacked the requisite intent, or at least that their intent is as yet indeterminate. Hence, a genuine dispute exists, one that can only be resolved by a trial on the merits.

■ However sound it may appear to be, the plaintiff's argument cannot withstand careful scrutiny. To begin, the Court notes that "the legal relationship of the parties will not be conclusively controlled by the mere terms which the parties use to designate the relationship...." *Frazell, supra,* at 463; *see also Haley v. Commissioner of Internal Revenue,* 203 F.2d 815, 818 (5th Cir.1953). As the Louisiana Supreme Court stated many years ago: "It is a matter of no importance that the parties did not intend that their agreement should be *called* a partnership. When two or more persons make an agreement which the law defines as a partnership, it is a partnership ... even though the parties may not have thought of such consequence." *Graham Paper Co. v. Lewis,* 159 La. 151, 154, 105 So. 258, 259 (La.1925) (emphasis added); *see also Fossier v. American Printing Co., Ltd.,* 130 So.2d 529, 532–33 (La.App.1961). What the court here must do, in classifying the relationship of Kerr-McGee and the minority-interest owners, is examine "the totality of the evidence." *Frazell, supra,* at 463; *Haley, supra,* at 818. In this case, all of the relevant evidence points to one conclusion: the parties to the two agreements intended to form a joint venture. No other account of what they intended seems plausible.

This is not to say, however, that identifying the relevant evidence is an easy task. It is not. The problem: Louisiana courts have not yet explained what intent is relevant in determining whether some group of individuals intends to engage in a joint venture. Is it the intent the individuals have with respect to sharing losses and profits? The intent they have with respect to sharing control? The intent they have with respect to engaging in the enterprise or undertaking? Some combination of these? Some combination plus other considerations? Dean O'Neal's comment on this problem is worth quoting in full:

The "intention" test, as applied both in Louisiana and in Anglo-American jurisdictions, is valueless. The meaning of a court is far from clear when it states that "the parties must intend to create a partnership." Sometimes the court means no more than that partnership is a consensual relation, that a person cannot be forced against his will to enter into such a relation. Undoubtedly, however, a court usually means something more, though exactly what is dubious. Courts invariably neglect to specify what the parties must intend. They do not enumerate the operative facts essential to a partnership or state exactly what relationships the parties must intend to assume in order to become partners. The courts themselves cannot agree on the factual elements characteristic of the partnership relation; yet they purport to base their decisions on a test which assumes that the contracting parties know what a partnership is. That the "intention" test is unsatisfactory is further demonstrated by the fact that courts using it either in Louisiana or in Anglo-American jurisdictions usually have to proceed to other criteria to ascertain the "real" intentions of the parties.

O'Neal, *supra,* at 357 (citations omitted). *But see* Tulane Note, *supra,* at 337–39 (arguing that intent test can be rendered intelligible but providing no guidance for determining what the relevant intent is).

How do we "ascertain the 'real' intentions of the parties"? The court in *Frazell* offered a good clue: "Each case must be considered *sui generis* and care must be exercised that consideration is given to the usages and practices characteristic of the particular commercial undertaking sought to be labeled a 'joint venture.'" *Frazell, supra,* at 463 (citing *Hero & Co. v. Farnsworth & Chambers Co., Inc.,* 236 La. 306, 107 So.2d 650 (La.1958) and *Pillsbury Mills, Inc. v. Chehardy,* 231 La. 111, 90 So.2d 797 (1956). The "particular commer-

cial undertaking" at issue here, as in *Frazell*, concerns the oil and gas industry. What the court concluded in *Frazell*, albeit somewhat obliquely is that the joint venturers in that case intended to do at least three things: They intended to engage in a joint undertaking; they intended to share both losses and profits; and they intended to share control of the enterprise.

Of particular significance in this regard is *Shell Oil Co. v. Prestridge*, 249 F.2d 413 (9th Cir.1957). In that case, Shell obtained oil and gas leases on a large tract of land in Idaho known as the Give Out Structure. Shell then entered into a drilling and exploration agreement with a partnership that subsequently assigned the agreement to the Rocky Mountain Oil Corporation ("Rocky Mountain"). The court described the terms of the agreement in the following way:

> Rocky Mountain was to drill a test well near the center of Lot 2, Section 30, Township 12 South, Range 46 East, Boise Meridian, on or before June 26, 1953. In consideration of such drilling, Shell agreed to assign the lease on said land to Rocky Mountain, along with other leases it had on the Give Out Structure, in a checkerboard fashion, that is, the leases to be assigned covered lands that were intermingled with lands, the leases of which Shell retained, in a checkerboard fashion. In all of such assignments Shell was to retain a royalty interest, and was to have the right to acquire all of the production encountered. Shell was to furnish all the title data on said lands and was to do all the geological work. Additionally, Shell was to contribute to the cost of drilling dry holes to the extent of $8,250. Shell was to be provided copies of all logs and other drilling data.

*Id.*, at 415. The plaintiff in *Prestridge* was injured while applying for work at one of Rocky Mountain's drilling sites. Following the accident, he sued both Shell and Rocky Mountain, claiming that the companies were jointly and severally liable as joint venturers.

The Ninth Circuit agreed with the plaintiff's theory of the case. The court found that Shell and Rocky Mountain had shared losses as well as profits, that the companies had shared control over the enterprise, that they had engaged in an undertaking, and that they had had the requisite intent. In discussing the intent of the companies, the court noted that, "as to third persons, the legal and not the actual intent controls." *Id.* at 416. Although the meaning of this statement is not altogether clear, the court appears to have had in mind the same thing Professor Williston did when he wrote:

> Even though the parties never intend to join in a common venture, if they actually intended to do the things which taken together would constitute a joint venture, they will be held as joint venturers insofar as third parties may be concerned, regardless of their desire to avoid personal liability.

S. Williston, 2 Contracts 563 (3d ed. 1959).

Louisiana courts have not drawn a distinction between "legal" intent and "actual" intent; at least they have not done so explicitly. *Cf. Graham Paper Co., supra*, 105 So. at 259 (what the parties intend for their relationship to be "called" is "a matter of no importance"). The courts have focused, instead, when they have focused on the issue at all, on "real" intent. O'Neal, *supra*, at 357. This type of intent appears to be the equivalent of what the *Prestridge* court called "legal" intent. Thus, the critical question here is: Did Kerr-McGee and the minority-interest owners "actually intend to do the things which taken together would constitute a joint venture?"[7]

---

**7.** Even if Louisiana courts did rely on the distinction between legal intent and actual intent, that would not change the result in this case. The reason is quite clear: Since the plaintiff here is a "third person," the relevant intent would be the companies' legal intent, not their actual intent. It is ironic, of course, that a distinction adopted primarily for the benefit of third persons would not benefit the third person in this case. But, again, the reason for this is quite clear: Kerr-McGee was the plaintiff's "borrowed employer." *West, supra*. Had this not

■ Clearly, the answer must be "yes." That the companies intended to share both losses and profits, that they intended to share control over the enterprise, that they intended to engage in a joint undertaking— all of these facts are undisputed. For this reason, the fact that the companies in § 17.1 of the operating agreement chose not to call their relationship a joint venture is irrelevant. Since they intended to do the things which taken together constitute a joint venture, the Court can only conclude that they intended to engage in a joint venture. This means, in short, that the plaintiff has failed to show that there is a genuine factual dispute regarding the first requirement for establishing the existence of a joint venture—the intent requirement. The relevant evidence shows that no such dispute exists.[8]

The same is true in regard to the remaining requirements. The relevant evidence shows, unmistakably, that all three have been met. The second requirement, that Kerr-McGee and the minority-interest owners share profits and losses, was satisfied by compliance with certain sections in the agreement, such as §§ 2.1 and 5.1. The defendants have offered evidence to prove compliance with the relevant sections, and the plaintiff has offered no evidence to the contrary. The third requirement, that each company have some right of control over the enterprise, was satisfied in a different way. Although Kerr-McGee controlled and managed the jointly-owned premises, the minority-interest owners retained the right to approve expenditures in excess of $10,-000 and to inspect the operations and the files. (*See* Operating Agreement, §§ 1.1, 1.2, 8.1 and 11.1). This, in the Court's opinion, was a sufficient sharing of control. Yet, even if it were not, the result would be

been the case, the distinction would have benefitted the plaintiff. He could have named Kerr-McGee and the minority-interest owners as joint venturers and sued all four of them in tort. In other words, had Kerr-McGee not been the plaintiff's "borrowed employer," the position of the parties would very likely be just the opposite from what it is now. The plaintiff would be arguing that the companies were joint venturers and the companies, or at least the minority-interest owners, would be arguing that they were not. This Court cannot help but believe that, even if Louisiana law did contain the distinction between legal and actual intent, Louisiana courts would not manipulate that distinction in the way it would have to be manipulated to benefit the plaintiff in this case; that is, they would not hold the legal intent is relevant only in cases where making it so would benefit third persons.

8. If what the companies intended for their relationship to be called were relevant, the problem facing the Court would be more difficult to resolve. Recall that the relevant language in § 17.1 reads: "It is not the intention of the parties to create, nor shall this Agreement be construed as creating[,] a mining or other partnership or association, or to render them liable as partners." The defendants explain the inclusion of this language in the operating agreement in the following way:

> The [ ] intent was to have a joint venture with the essential attributes of a partnership but which could permit the venturers to avail themselves of the provisions of the Internal Revenue Code [§ 761(a) ], permitting them to

elect not to be treated as a partnership for the purposes of Federal taxation. By virtue of Section 17.1 of the Operating Agreement, the parties elected to have the joint venture excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1954, as amended, and from similar provisions of any subsequent Internal Revenue laws of the United States.

(Affidavit of Daniel E. Chieco).

The matter is not so simple, however. Section 20.1 of the operating agreement reads, in relevant part: "Each of the parties hereto elects, under the authority of Section 761(a) of the Internal Revenue Code of 1954, to be excluded from the application of all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1954." The addition of this section complicates matters for two reasons. First, under Louisiana law, every clause in a contract is to be interpreted, whenever reason permits, in a way that does not render the clause redundant. LSA–C.C. art. 1951; *Green v. Southern Furniture Co.,* 94 So.2d 508 (La.App.1957). Second, the defendants' interpretation of § 17.1 does just that; it renders the relevant language in § 17.1 redundant since the aim that language is designed to achieve is the very same aim the relevant language in § 20.1 is designed to achieve. The question thus arises: Can the relevant language in § 17.1 be reasonably interpreted in a way that does not render it redundant? This question need not be answered here, however. It pertains to what the companies intended for their relationship to be called and, according to the Court's appreciation of Louisiana law, that intent is irrelevant.

the same. For under Louisiana law, "parties may agree that the administration of the partnership or joint venture will be entrusted to one or more of the partners or joint venturers *exclusively.*" *Frazell, supra,* at 462 (emphasis added); *see also* Comment, *supra,* at 386–87. Apart from the exceptions just noted, Kerr-McGee and the minority-interest owners availed themselves of this rule in § 1.2 of the Operating Agreement. (See *id.* at § 1.2; *see also* Affidavit of William Gedwel).

The way in which Kerr-McGee and the minority-interest owners satisfied the fourth requirement, the requirement that they engage in a joint undertaking, reveals the fundamental flaw in the plaintiff's opposition. The plaintiff contends that the companies were never more than co-owners of the platform. The facts show otherwise. They indicate that co-ownership of the platform played but a small part in the companies' overall undertaking. Much was done prior to construction of the platform. The companies submitted joint bids for leases, acquired leases, exchanged geological data, formulated strategies for exploration and production, and developed a plan for managing the operation. After the platform was constructed, the companies proceeded according to plan. This was co-ownership combined with what courts have quaintly called an "adventure." *See generally Bond v. O'Donnell,* 205 Iowa 902, 218 N.W. 898 (1928); *Hathaway v. Porter Royalty Pool,* 296 Mich. 90, 295 N.W. 571, *amended,* 296 Mich. 733, 299 N.W. 451 (Mich.1941); *see also* 46 *Am.Jur.2d,* Joint Ventures, §§ 6 and 21 (1969). It was, without a doubt, an undertaking. And so it was, without a doubt, a joint venture. No

other description would adequately characterize the companies' relationship.[9]

 The foregoing analysis shows that the minority-interest owners have satisfied all four requirements needed to establish a joint venture. They have proved intent, loss and profit sharing, control, and the existence of an undertaking. Given this, the Court hereby GRANTS the motion for summary judgment filed by Felmont, Cabot, and Case.

9. The following observation is relevant here:

Since businessmen have great freedom in deciding upon the nature and terms of the business associations into which they enter, they may find it advisable in certain instances to formulate agreements which will not at a later date be termed joint ventures by the courts. Other relationships which may accomplish the purposes of a joint venture in a given situation, and yet which will not have the legal effects of a partnership are principal and agent, principal and independent contrac-

tor, contractor and subcontractor, principal and surety, buyer and seller, borrower and lender, employer and employee, landlord and tenant and joint owners.

Comment, *supra,* at 384 (citations omitted). None of the "other relationships" mentioned in the Comment appears to be suitable as a characterization of the relationship between Kerr-McGee and the minority-interest owners. The plaintiff, apart from *urging the* Court to classify the companies solely as joint owners, has not suggested otherwise.