**SHELL OIL COMPANY, a Corporation,**
**Appellant,**

v.

**Lanus Wayne PRESTIDGE, Appellee.**

**No. 15365.**

United States Court of Appeals
Ninth Circuit.

Nov. 4, 1957.

Rehearing Denied Dec. 4, 1957.

Claude Marcus, Blaine F. Evans, Boise, Idaho, Grant C. Aadnesen, Salt Lake City, Utah, for appellant.

Glenn A. Coughlan, Boise, Idaho, Milton E. Zener, Pocatello, Idaho, for appellee.

Before HEALY and FEE, Circuit Judges, and MURRAY, District Judge.

## W. D. MURRAY, District Judge.

Between 7:00 and 7:30 o'clock on the morning of June 1, 1954, Lanus Wayne Prestidge, appellee herein, and a companion, visited the site where Rocky Mountain Oil Corporation was drilling for oil near Montpelier in Bear Lake County, Idaho, for the purpose of seeking employment. At the time they arrived at the site, the day's work had not commenced and Clarence S. Robinson, the Drilling Superintendent on the operation, whom they wanted to see concerning employment, was not present. While waiting for Mr. Robinson, Prestidge and his companion joined the drilling crew around a fire which the crew had started for the purpose of warming themselves before commencing work. While Prestidge and his friend were waiting around the fire for Mr. Robinson to put in his appearance, one of the drilling crew poured diesel oil on the fire to make it burn better. This resulted in fire being splashed on Prestidge, burning him.

As a result of his injuries from being burned, Prestidge instituted an action against Rocky Mountain Oil Corporation, Shell Oil Company and Stony Point Development, Inc. Stony Point Development Company was subsequently dismissed from the action by stipulation, and the case continued against Rocky Mountain and Shell.

In the first trial of the case, as in the second trial, which is on review here, it was apparently plaintiff's theory that Shell Oil Company and Rocky Mountain Oil Corporation were joint venturers engaged in the search for oil in the area concerned, or that Rocky Mountain was the agent of Shell in drilling the well where the injury occurred. Shell's position was that Rocky Mountain was an independent contractor, for whose negligence Shell was not responsible, and at the close of plaintiff's case, Shell moved for a directed verdict in its favor on that basis. The motion for directed verdict was denied, and after being instructed on the law of joint venture, principal and agent and independent contractor, the jury returned a verdict in favor of plaintiff and against Shell and Rocky Mountain jointly in the sum of $19,905.85, and judgment for plaintiff was accordingly entered.

Thereafter, upon Shell's Motion for Judgment in Accordance with its Motion for Directed Verdict, the District Court vacated the judgment for plaintiff and entered judgment for defendant Shell Oil Company upon the basis that it had erred in submitting to the jury the question of the relationship existing between Shell and Rocky Mountain, and that as a matter of law, the written contract between them established the relationship of Rocky Mountain to Shell to be that of independent contractor, for whose negligence Shell was not responsible.

Plaintiff thereupon filed a motion for new trial, supported by affidavits, on the ground, among others, of newly discovered evidence. The motion was granted and upon the second trial the jury returned a verdict in favor of plaintiff for $10,000.00, judgment was entered thereon, and from that judgment Shell appeals.

The principal ground urged for reversal is that the District Court erred in the second trial in again submitting to the jury the question as to the relationship which existed between Rocky Mountain and Shell. It is the position of Shell that the written agreement, under which Rocky Mountain was drilling the well where the injury to plaintiff occurred, conclusively establishes Rocky Mountain as an independent contractor of Shell as a matter of law, and that the District Court should have so construed the written agreement and dismissed the action as against Shell, or ordered a directed verdict in its favor, upon the ground that it could not be held responsible for the negligence of its independent contractor. No issue is raised on this appeal as to the negligence of Rocky Mountain.

A brief outline of the background against which the accident occurred is

necessary. It appears that Shell Oil Company owned oil and gas leases on a large area of land in Bear Lake County, Idaho, on what is known as the Give Out Structure. The drilling site, where plaintiff was burned, is described as Lot 2, Section 30, Township 12 South, Range 46 East, Boise Meridian. This parcel of land is government land upon which an oil and gas lease was originally granted by the government to one Ragner Barhaug on February 1, 1949. Barhaug assigned his lease to Shell. On December 26, 1952, the agreement with which we are here concerned was entered into between Shell Oil Company and one Wheeler and Gray, a partnership, and thereafter Wheeler and Gray, with the consent of Shell, assigned the agreement to Rocky Mountain Oil Corporation by an instrument dated March 6, 1953, entitled "Assignment". It appears that on February 1, 1954, the original government lease to Barhaug expired by reason of nonpayment of rental, and thereafter, the same land was leased by the government, on April 29, 1954, to one G. W. Anderson, who assigned his lease to Rocky Mountain Oil Corporation. On June 11, 1954, 10 days after the accident here involved, Rocky Mountain agreed in writing that the lease it had obtained from G. W. Anderson was subject to the agreement that it, Rocky Mountain, had with Shell.

Under the terms of the agreement between Shell Oil Company and Wheeler and Gray, dated December 26, 1952, which was assigned to Rocky Mountain, and which will be hereinafter referred to as the agreement of December 26, 1952, Rocky Mountain was to drill a test well near the center of Lot 2, Section 30, Township 12 South, Range 46 East, Boise Meridian, on or before June 26, 1953. In consideration of such drilling, Shell agreed to assign the lease on said land to Rocky Mountain, along with other leases it had on the Give Out Structure, in a checkerboard fashion, that is, the leases to be assigned covered lands that were intermingled with lands, the leases of which Shell retained, in a checkerboard fashion. In all of such

assignments Shell was to retain a royalty interest, and was to have the right to acquire all of the production encountered. Shell was to furnish all the title data on said lands and was to do all the geological work. Additionally, Shell was to contribute to the cost of drilling dry holes to the extent of $8,250. Shell was to be provided copies of all logs and other drilling data.

To warrant reversal of this cause on the ground that Shell cannot be held liable for the negligence of Rocky Mountain, it must be found that the agreement of December 26, 1952, conclusively establishes, as a matter of law, that Rocky Mountain was the independent contractor of Shell. For if, either as a matter of law from the agreement alone, or as a matter of fact from the agreement and all other evidence in the case, it can be said that the relationship between Shell and Rocky Mountain was that of joint adventurers, Rocky Mountain's negligence would be imputed to Shell, and the judgment must be affirmed.

■■■ A joint adventure has been broadly defined as an association of two or more persons who combine their property, money, efforts, skill or knowledge to carry out a single business enterprise with the objective of realizing a profit. 30 Am.Jur., Sec. 3, p. 677. Dunclick, Inc., v. Utah-Idaho Concrete Pipe Co., 77 Idaho 499, 295 P.2d 700; Stearns v. Williams, 72 Idaho 276, 240 P.2d 833; Rae v. Cameron, 112 Mont. 159, 114 P.2d 1060. While the Courts have not laid down a more precise, all-embracing definition of the relationship, they have in various cases recognized certain elements as being essential to the existence of it. Thus a contract between the parties, a common purpose, a community of interest, mutual control over the subject matter of the enterprise or over the property engaged therein, have been held to be elements necessary to the existence of a joint venture. Eagle Star Ins. Co. v. Bean, 9 Cir., 134 F.2d 755; Carboneau v. Peterson, 1 Wash.2d 347, 95 P.2d 1043. Contribution by the parties of property, money, efforts, skill or knowledge to the

common enterprise is also essential, but their contribution need not be equal or of the same character. 30 Am.Jur., Sec. 10, p. 682; Stearns v. Williams, supra. Agreement to share in the profits and losses of the enterprise is also essential to a joint venture, although there is some authority to the effect that the sharing of losses is not necessary. 30 Am.Jur., Sec. 12, p. 682. Stearns v. Williams, supra; Rae v. Cameron, supra. Finally, the intent of the parties is controlling but as to third persons, the legal and not the actual intent controls. Stearns v. Williams, supra; Aiken Mills v. U. S., D.C., 53 F.Supp. 524, affirmed 4 Cir., 144 F.2d 23.

Considering then the relationship existing between Shell and Rocky Mountain in the light of the foregoing discussion of joint venture, it is found that even considering the agreement of December 26, 1952, alone, the relationship established by that agreement has all the essentials required of a joint venture.

First, of course, there was a contract. Under the contract Shell and Rocky Mountain associated themselves together for the purpose of carrying out a business enterprise with the objective of realizing a profit. In this connection, all of the arguments advanced by appellant are based on the proposition that the enterprise under consideration was merely the drilling of the single test well, at the site of which the injury to plaintiff occurred. We think appellant's view of the enterprise is too narrow. It is apparent, both from the agreement of December 26, 1952, and the assignment dated March 6, 1953, that the enterprise in which the parties were engaged was the development of the entire Give Out Structure for the production of oil, and that the drilling of the test well on Lot 2 of Section 30 was but one phase of the enterprise. Thus the assignment to Rocky Mountain of leases interspersed with leases retained by Shell in a checkerboard fashion over the entire structure and the provision in the agreement for the drilling of additional wells at other locations on the structure in the event the first well was successful show the objective of the enterprise was the development of the Give Out Structure as a whole. These same considerations likewise illustrate the common purpose and the community of interest of the parties. The leases which Shell was to assign to Rocky Mountain covered approximately 2600 acres, according to the assignment of March 6, 1953, and with Shell retaining at least an equal acreage, the common purpose to develop the structure, and the community of interest in such development cannot be doubted.

Both companies made substantial contributions to the enterprise. Under the agreement of December 26, 1952, Shell was to furnish the leases, title data with regard to the leases, geological services, and it was to participate in the cost of the first test well to the extent of $8,250. Rocky Mountain, under the agreement, was to do the drilling of the test well, perform tests, bearing all the costs thereof except the $8,250 that was to be contributed by Shell. In the event the enterprise did not achieve success, the two companies would share in the losses resulting to the extent of their contributions, and the profits, if any, would be shared, Rocky Mountain realizing its share by virtue of being the owner of the assigned oil and gas leases, and Shell realizing its share by virtue of the royalty interests it retained in the assignment of the leases to Rocky Mountain.

As to the joint control of the enterprise, which appellant stoutly maintains is lacking, we think this element too is shown. Under one provision of the agreement, drilling on the test well was to continue until "(a) it is drilled to the vertical depth of 5,000 feet below the surface, or (b) it is drilled to a depth sufficient to test the Nugget formation to the satisfaction of Shell, or (c) *the parties hereto shall determine that further drilling therein would not be warranted, whichever first occurs.*" Under that provision Shell and Rocky Mountain had joint control of the enterprise to the

extent of determining when drilling of the test well should be discontinued.

Furthermore, Edwin W. Windolph, General Superintendent of the drilling operation for Rocky Mountain, and one of the persons whose affidavit supported the motion of appellee for a new trial on the basis of newly discovered evidence, testified at the second trial that Shell Oil Company, through the person of its geologist, did in fact exercise control over the actual drilling to the extent of requesting that drilling be stopped, the drills be pulled, and tests taken, and these requests were complied with by Rocky Mountain on two occasions. True, these occasions were after the accident happened, but the geologist was at the site when the accident happened, and there is no showing that his authority was any less before the accident than it was after. As far as the record shows, his authority was the same all the time he was on the job. We think that under the provisions of the agreement alone there was sufficient joint control of the enterprise provided to establish a joint venture, as a matter of law, and certainly the agreement, supplemented by Mr. Windolph's testimony, furnished an adequate foundation for the jury to find a joint venture.

Aside from the fact that joint control of the enterprise was provided for in the agreement, and was in fact exercised by Shell through its geologist, there is also the principle recognized in the case of Eagle Star Ins. Co. v. Bean, supra, that while equal voice and joint control of the enterprise is essential to a joint venture, one of the joint adventurers may entrust actual control of the operation to another, and it still remains a joint venture. This case provides an apt illustration of that principle. As pointed out, the enterprise in which the two companies were engaged was the development of the Give Out Structure. The drilling phase of that enterprise was entrusted by Shell to Rocky Mountain, although as pointed out Shell did exercise some control even over the drilling. However, in the absence of that evidence,

the enterprise, with all of the other elements of a joint venture, would not be any the less a joint venture by virtue of Shell entrusting the drilling operation to Rocky Mountain.

All of the circumstances of the relationship between Shell and Rocky Mountain outlined above compel a finding of the legal intent to engage in a joint venture, and as pointed out in Stearns v. Williams, supra, as to third persons, it is the legal and not the actual intent that controls.

Appellant's specifications of error not above disposed have to do with rulings on the admissibility of evidence. We have considered these rulings and the evidence and find no error prejudicial to appellant.

Affirmed.