Tamela Gayle Ward BOLIVAR, Administratrix of the Estate of Donnie Ray Bolivar, Deceased, Tamela Gayle Ward Bolivar, and Cathy Gayle Bolivar, Brandy Nichole Bolivar and Justin Allen Bolivar, Minors, by Tamela Gayle Ward Bolivar, Mother and Next Friend, Plaintiffs,

v.

R & H OIL AND GAS COMPANY, INC., Allen Keith Robertson and H.D. Burns, Sr., Defendants.

Charles WINDHAM, Plaintiff,

v.

R & H OIL AND GAS, INC., Allen Keith Robertson, and H.D. Burns, Sr., Defendants.

Rosie Jean KENNEDY, Individually and Administratrix of the Estate of Dewayne Kennedy, Deceased and as Next Friend of Alvin Corneilous Wilson and Joseph Dewayne Wilson, Minors, and Katherine Vickers as Next Friend of Christopher Alexander Vickers, a Minor, Individually, Plaintiffs,

v.

R & H OIL AND GAS COMPANY, INC., Henry David Burns, Sr., a/k/a H.D. Burns, Sr., Jointly and Severally, Defendants.

Civ. A. Nos. E90–0094(L), E90–0093(L) and E90–0092(L).

United States District Court, S.D. Mississippi, E.D.

March 26, 1991.

Thomas A. Cook, Charles G. Copeland, Lee Howell, III, Copeland, Cook, Taylor & Bush, Jackson, Miss., H. Alex Brinkley, Hattiesburg, Miss., for plaintiffs.

Walker W. Jones, III, William C. Brabec, Joseph A. Ziemianski, Phelps, Dunbar, Marks, Claverie & Sims, Jackson, Miss., for R & H Oil.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

Plaintiffs in the above styled actions, Tamela Gayle Bolivar, Administratrix of the Estate of Donnie Ray Bolivar, deceased, and Rosie Jean Kennedy, individually and as Administratrix of the Estate of Dewayne Kennedy, deceased, brought wrongful death actions, and Charles Windham brought a personal injury action against R & H Oil and Gas, Inc. (R & H), a non-resident of Mississippi, and Henry D. Burns, Sr., a Mississippi resident, following a May 29, 1990 explosion of methane and hydrogen sulfide gases that occurred when the Travis No. 3 Well near Heidelberg, Mississippi blew out during a workover operation. At the time of the blowout, R & H was operator and part-owner of the well; Burns owned a working interest in the well. Allen Keith Robertson, a Louisiana resident and R & H's vice-president and "company man" at the well site, was also named as a defendant in the Bolivar action. Plaintiffs initiated their lawsuits in the Circuit Court of the First Judicial District of Jasper County, Mississippi,[1] purporting to state claims against defendants based on negligence in the operation and maintenance of the well and well site and strict liability for the performance of an abnormally dangerous activity. Defendants removed the cases to this court, asserting that defendant Burns was a nonconsenting working interest owner in the well who had no personal involvement in the actual operation or control of the well and who therefore, as a matter of law, could have no liability to plaintiffs for the acts complained of. Defendants charged that Burns had been fraudulently joined for the sole purpose of defeating diversity jurisdiction under 28 U.S.C. § 1332.

Following removal, Burns moved in each of the three actions for summary judgment advancing in support of his motion the same grounds set forth in the petition for removal, i.e., that he had no liability to plaintiffs since he was merely a nonconsenting working interest owner in the well and had never in any manner participated in or attempted to control the performance of any work at the well. The plaintiffs in the respective cases moved for remand to state court, contending that Burns was properly joined as a defendant since plaintiffs' complaints stated viable claims for recovery against Burns; consequently, according to plaintiffs, the court lacks subject matter jurisdiction over these cases.

### Facts

R & H acquired its interest in the Travis No. 3 Well from Shell Western E & P, Inc. (SWEPI) pursuant to an assignment and bill of sale which was executed on March 2, 1990, with an effective date of January 1, 1990. R & H took its interest subject to the terms of an operating agreement dated April 1, 1969 between Shell Oil Co., Central Oil Co. and Chesley Pruett, and R & H agreed to assume all obligations of SWEPI under the operating agreement. Burns, who had in 1970 contributed his lease to the unit when SWEPI was the well operator, was not a signatory to the operating agreement. When it took over the well, R & H was provided by SWEPI with a list of non-operating working interest owners who had participated in Shell's operations at the well prior to R & H's acquisition. Only 1.38% of the leasehold estate was owned by Mississippi residents; of this amount, Burns owned .38% and various relatives of his owned the remaining 1%. The out-of-state nonoperators included Louis Robertson, the brother of R & H's president who owned 37.51%; Cairn Energy U.S.A., Inc. in Dallas, Texas owned 12.34%; and Chesley Pruett in Arkansas owned 9.68%.

---

1. The Windham and Kennedy suits were filed in the Jasper County Circuit Court on July 15, 1990, followed by the filing of the Bolivar suit on August 3, 1990.

It is undisputed that R & H intended to purchase all non-operators' interests in the leasehold estate, except that owned by Louis Robertson, and toward that end, R & H sent letters to all nonoperators offering to purchase their interests. Attached to the letter from R & H offering to purchase Burns' interest was an authorization for expenditure (AFE) which apprised Burns that R & H proposed to perform a workover operation on the Travis No. 3 Well to attempt to reestablish production from the well. These documents were mailed to Burns on April 24, 1990, and on the same date, R & H began the workover operation described in the AFE. Burns had not responded to the offer to purchase his interest, nor had he returned the AFE prior to the blowout which occurred on May 29, 1990.[2]

It is further undisputed that in connection with the reworking operation, Allen Keith Robertson, on behalf of R & H, contracted with Farrar Oilfield Services, Inc. to perform the workover operation. Either during the workover itself, or during the process of placing the well back on production, the blowout occurred.[3] Each of the plaintiffs, from what the court is able to discern, was employed by Farrar when the blowout occurred.[4]

Standard for Consideration of Remand

■ Because the motion to remand calls into question this court's jurisdiction to act in these cases, it will be first considered, since "a trial court must be certain of its jurisdiction before embarking upon a safari in search of a judgment on the merits."

B., Inc. v. Miller Brewing Co., 663 F.2d 545, 548–49 (5th Cir.1981). The defendants bear the "heavy" burden of demonstrating fraudulent joinder. Carriere v. Sears, Roebuck and Co., 893 F.2d 98, 101 (5th Cir.) (citing Laughlin v. Prudential Ins. Co., 882 F.2d 187, 190 (5th Cir.1989)), cert. denied, —— U.S. ——, 111 S.Ct. 60, 112 L.Ed.2d 35 (1990). To sustain their burden, it is incumbent on defendants to establish that the plaintiffs have no possibility of recovery against Burns:

> [W]here the removing party grounds its allegations of "fraudulent joinder" upon a theory that the plaintiff cannot recover from the in-state defendant as a matter of law, the trial court should resolve all disputed questions of fact in favor of the plaintiff and then determine whether there could possibly be a valid cause of action set forth under state law.

B., Inc. v. Miller, 663 F.2d at 551; see also Carriere, 893 F.2d at 100. In Parks v. New York Times Company, 308 F.2d 474, 477 (5th Cir.1962), cert. denied, 376 U.S. 949, 84 S.Ct. 964, 11 L.Ed.2d 969 (1964), the court explained as follows:

> The joinder is fraudulent if it is clear that, under the law of the state in which the action is brought, the facts asserted by the plaintiff as the basis of liability of the resident defendant could not possibly create such liability so that the assertion of the cause of action is as a matter of local law plainly a sham and frivolous. And a joinder is fraudulent if the facts asserted with respect to the resident de-

---

2. The letter to Burns was dated March 22, 1990 and advised that R & H had purchased SWEPI's interest and taken over as operator of the field. The letter contained an offer by F & H to purchase Burns' interest on the same basis as its purchase of Shell's interest. The AFE was dated April 18, 1990 and was attached to the letter. It is undisputed that both documents were mailed April 24, 1990.

3. Plaintiffs characterize the event giving rise to this litigation as a "blowout" which occurred during a reworking of the well. Defendants contend that there was no blowout, but merely a well fire, and that the fire occurred at a time after the reworking operation had concluded. The court will accept plaintiffs' allegations as true.

4. Defendants describe the events leading up to the blowout as follows: In an attempt to place the well back on production, R & H attempted unsuccessfully to seat a hydraulic pump at the bottom of the well. R & H hired Otis Wireline Company to try to "bump" the pump down. On Otis' second attempt, on May 27, 1990, it lost in excess of 1100 feet of wireline and some of its wireline equipment in the hole. A decision was made to pull all tubing out of the hole so that the wireline and wireline equipment could be removed and the pump properly seated. The Farrar rig crew was in the process of pulling the tubing when the fire, or according to plaintiffs, the blowout, occurred.

fendant are shown to be so clearly false as to demonstrate that no factual basis existed for any honest belief on the part of plaintiff that there was joint liability. The Fifth Circuit has consistently advised that in making determinations of fraudulent joinder, the trial court should avoid pretrying substantive issues of fact:

> A district court need not and should not conduct a full scale evidentiary hearing on questions of fact affecting ultimate issues of substantive liability in a case in order to make a preliminary determination as to the existence of subject matter jurisdiction. The question of whether the plaintiff has set forth a valid claim against the in-state defendant(s) should be capable of summary determination.

*B., Inc.*, 663 F.2d at 551. At the same time, however, the district court may pierce a plaintiff's pleadings to determine whether there exists, in fact, a basis for imposing liability against the resident defendant.

> While we have frequently cautioned the district courts against pretrying a case to determine removal jurisdiction, we have also endorsed a summary judgment-like procedure for disposing of fraudulent joinder claims. In [*B., Inc.*], we carefully discussed the procedures for assessing fraudulent joinder claims and noted that "the proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment...." *Id.* at 549 n. 9. The *B., Inc.*, court expressly authorized consideration of evidence outside of the pleadings:

>> In support of their removal petition, the defendants may submit affidavits and deposition transcripts; and in support of their motion for remand, the plaintiff may submit affidavits and deposition transcripts along with the factual allegations contained in the verified complaint.

*Id.* at 549. Similarly, in *Keating v. Shell Chemical Co.*, 610 F.2d 328 (5th Cir. 1980), we approved "piercing the pleadings" to determine controlling state law for purposes of resolving fraudulent joinder questions. We remanded that case for a determination "[b]y summary judgment or otherwise" whether joinder was fraudulent. *Id.* at 333.

In short, this circuit treats fraudulent joinder claims as capable of summary determination. When determining fraudulent joinder, the district court may look to the facts as established by summary judgment evidence as well as the controlling state law.

*Carriere,* 893 F.2d at 100.

### Defendants' Claim that Burns Lacked Ownership Interest

As defendants correctly observe, each of the several theories of recovery espoused by plaintiffs is contingent upon Burns having an ownership interest in the well at the time of the fire. In response to plaintiffs' motions to remand, as well as in support of Burns' motion for summary judgment, defendants urged that Burns could have no liability to plaintiffs as a matter of law because at the time of the fire he had relinquished all of his rights in the well under the operating agreement to consenting parties. In support of this contention, defendants relied exclusively on a provision in the operating agreement which states that when a party to that agreement fails within thirty days to respond to a notice of a proposed workover, his failure will be treated as an election not to participate in the cost of the proposed operation, and as a nonconsenting party, he will be considered to have relinquished all of his interest in the well to the consenting parties until the proceeds, if any, from the well equal the total of 100% plus a 300% penalty.[5] Defen-

---

**5.** The agreement provides, specifically, as follows:

> If all the parties cannot mutually agree upon ... the reworking ... of a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties ... any parties wishing to ... rework ... such a well may give the other parties notice of the proposed operation.... The parties receiving such a notice shall have thirty (30) days ... after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation. Failure of a party receiving such a notice to so reply to it within the period above fixed shall constitute an elec-

dants initially argued that since Burns had been given notice of the proposed workover by R & H but failed to respond, he thereby became a nonconsenting party and was deemed by R & H to have relinquished his interest in the well. However, in response to certain proposed findings of fact and conclusions submitted by plaintiffs, defendants admitted that Burns was not a party to the joint operating agreement between Shell Oil Company (and its successor, R & H), Central Oil Company and Chesley Pruett, and they therefore presumably concede that their argument in this regard must fail.

Imputed Negligence

### Joint Venture

■ Recognizing that Burns had no active participation in the operation of the well, plaintiffs seek to impose liability against Burns under a theory of imputed negligence. They argue that each of the defendants, including Burns, was participating in a joint venture to develop and operate the Travis No. 3 Well for profit and that each defendant thus bears liability for personal injuries suffered at the drill site. Defendants acknowledge that a working interest owner could possibly be held liable for the torts of the operator if a joint venture existed between the two, and the law of Mississippi supports that proposition. *See Choctaw, Inc. v. Wichner*, 521 So.2d 878, 881 (Miss.1988) (citing *McCorkle v. United Gas Pipe Line Co.*, 253 Miss. 169, 175 So.2d 480 (1965), and *Marr v. Nichols*, 208 So.2d 770 (Miss.1968)); *Sample v. Romine*, 193 Miss. 706, 8 So.2d 257, 260 (1942). They contend, though, that there does not exist in this case any factual basis which would support a finding that there was a relationship of joint venturers between Burns and R & H.

In *Hults v. Tillman*, 480 So.2d 1134 (Miss.1985), the Mississippi Supreme Court explained the law in Mississippi on joint ventures, as was originally established in the case of *Sample v. Romine*, 193 Miss. 706, 8 So.2d 257, *modified*, 193 Miss. 706, 10 So.2d 346 (1942):

> In *Sample v. Romine*, the leading Mississippi case on the subject, this Court first observed no exact definition could be given of a joint venture, the answer in each case depended upon the terms of the agreement, the acts of the parties, the nature of the undertaking and other facts. We broadly defined a joint venture as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, efforts, skill and knowledge. We said it exists when two or more persons combine in a joint business enterprise for their mutual benefit with an understanding that they are to share in profits or losses and each to have voice in its management. We noted a condition precedent for its existence was a joint proprietary interest and right of mutual control. The joint purpose of the enterprise distinguishes it from a mere tenancy in common. We further held that an agreement, express or implied, for sharing in the profits is essential, but there need be no specific agreement to share in the losses, and if the nature of the undertaking was such that no losses other than those of time and labor in carrying it out was likely to occur, an agreement to share in the profits might stamp it as a joint venture, although nothing was said about the losses. We said a contract between the parties was necessary, but it need not be embodied in a formal agreement, but might be in-

---

tion by that party not to participate in the cost of the proposed operation....

.  .  .  .  .

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions that their respective interests ... bear to the total interests of all Consenting Parties.... Upon commencement of operations for the ... reworking ... of any such well by Consenting Parties in accordance with the provisions of this section,

each Non–Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non–Consenting Party's interest in the well, its leasehold operating rights, and share of production therefrom until the proceeds or market value thereof ... shall equal the total of the following: [100% of all costs plus a 300% penalty].

ferred from the facts, circumstances and conduct of the parties. Finally, we said it differed from a general partnership because it related to a single transaction while a partnership usually related to a general and continuing business, and that a joint venture was of a shorter duration and the agreement was less formal.

*Hults,* 480 So.2d at 1142. In the case *sub judice,* defendants argue that the elements or indicia of a joint venture between Burns and R & H are absent since there was no contract establishing a joint venture, the parties did not have the intent to form a joint venture, and Burns had neither actual control nor the right of mutual control over the drilling operations at the well site.

In *Hults,* as in *Sample,* the court faced the question of the existence of a joint venture as between the parties themselves. The *Hults* court suggested, however, that where third parties are involved, the elements for showing the existence of a joint venture might differ somewhat, *id.* at 1145, and it indeed is generally recognized that as to third persons the objective manifestations of the putative joint venturers govern in determining whether a joint venture in fact exists. It has been said that "[a]s between the parties, although not necessarily as to third persons, a contract is essential to create the relation of joint venturers." 46 Am.Jur.2d *Joint Ventures* § 8 (1969). Moreover,

> [a]s between the parties themselves, the relationship of joint venturers is a matter

of intent, and arises only where they intend to associate themselves as such.... As to third persons, it is clearly the rule that the legal and not the actual intent of the parties controls, and the parties may be estopped from denying that they are joint venturers even though they never intended to become such. If the intent to do those things which constitute a joint venture exists, the parties will be joint venturers even though they also intended to avoid the personal liability that attaches to joint venturers.

*Id.* at § 9; *see also Shell Oil Co. v. Prestidge,* 249 F.2d 413, 416 (9th Cir.1957). Thus, that there may not have been a contract between R & H and Burns for the work that R & H performed relative to the Travis No. 3 Well,[6] or that R & H and Burns may never have actually intended to form a joint venture is not dispositive of the issue presented.[7] However, one component of the *Sample* criteria for joint ventures that is the same, whether the action is one between the parties or one by third persons, is the right of mutual control.

It is undisputed that Burns never exercised any control over the workover operations performed at the instance of R & H prior to the accident. But it is not the actual exercise of control that is determinative. Rather, it is the *right* to exercise control that governs. This factor was addressed by the Ninth Circuit in *Eagle Star*

6. In Mississippi, an "agreement to share in the expense of the development of mineral interests must be in writing ... to be enforceable." *Hunt Energy Corp. v. Crosby–Mississippi Resources, Ltd.,* 732 F.Supp. 1378, 1382 (S.D.Miss.1989); *see also Huffco Petroleum Corp. v. Massey,* 834 F.2d 540, 542 (5th Cir.1987); *Sonat Exploration Co. v. Mann,* 785 F.2d 1232, 1234 n. 1 (5th Cir.1986). This rule, though, has been made applicable only as to disputes between parties to an alleged agreement; there is nothing to indicate that it would also apply in disputes with third parties. Of course, whether or not a contract existed would generally prove to be of at least some relevance in determining the existence of a joint venture, even in the case of claims made by third parties, since it bears on the intent to embark upon a joint venture.

7. In support of their averment that these parties did not intend to establish a joint venture, defendants rely on an affidavit submitted by Burns in which he states that he never intended to form a joint venture with R & H, and his deposition testimony in which he said that he did not want to spend any more money in the Travis No. 3 Well since he thought it would be commercially unprofitable. They also refer the court to a provision in R & H's operating agreement which states, "It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render them liable as partners." While these assertions of Burns and R & H as to their intent would be relevant in an action between them, under the principle set forth in the text, they are not determinative in these actions by third parties.

*Insurance Co. v. Bean,* 134 F.2d 755, 758 (9th Cir.1943):

> [T]he joint adventurers must have equal voice and control in the operations of the enterprise, but ... one of the adventurers [can] entrust actual control to another.
>
> "... By this is meant that each of the parties has an equal right in the management and conduct of the undertaking, and that each may equally govern upon the subject of how, when, and where the agreement shall be performed. If the will or pleasure of one party is to control the others in these respects, there is no joint adventure.
>
> "As a corollary to the preceding requirement, it follows that each party must have an equal right of control over the agencies used. This, of course, does not mean that each has the right to interfere at will with the driver to whom the duty of operating an automobile has previously been intrusted. *It does mean, however, that each has an equal right of general supervision over the instrumentality, equal authority in directing how the instrumentality is to be used in the performance of the enterprise, and, likewise, equal responsibility for the manner of such performance.*"

*Eagle Star,* 134 F.2d at 758 (quoting *Carboneau v. Peterson,* 1 Wash.2d 347, 376, 95 P.2d 1043, 1055 (1939)) (emphasis added). This principle was reiterated in *Shell Oil Co. v. Prestidge,* 249 F.2d 413, 417 (9th Cir.1957), wherein the court stated that "one of the joint adventurers may entrust actual control of the operation to another, and it still remains a joint venture." *Id.* at 416–17. The court then concluded that Shell, a nonoperating interest owner, enjoyed joint control of the enterprise since, by virtue of its contract with the operator, Shell had the right to determine when drilling of the well should be discontinued, and since Shell had, in fact, exercised actual control to the extent of its having requested on at least two occasions that drilling be stopped. *Id.* at 417; *see also Choctaw, Inc. v. Wichner,* 521 So.2d 878, 881 (Miss. 1988) (refusing to impute negligence against a party who has no control over the conduct of the tortfeasor giving rise to the cause of action).

By their citation to *Eagle Star* and *Prestidge,* plaintiffs seem to suggest that Burns had a right of control in connection with the reworking of the Travis No. 3 Well. They have failed, however, to suggest any facts which would support this contention. There is no indication whatsoever that Burns had any authority over the general operations performed by R & H nor of the specific manner in which those operations were executed. The contrary, in fact, appears. It is uncontroverted that prior to his receipt of the AFE from R & H for the workover operation, Burns was not even aware that R & H was the operator of the well, and Burns had no contact with anyone at R & H regarding the workover operation. It is further uncontradicted that R & H actually commenced the reworking operation on the same day that it sent to Burns the AFE for the proposed work, thus demonstrating that R & H's actions with reference to the well would have been the same regardless of whether or not Burns had elected to participate in the operation.[8] That is, a response from Burns indicating his approval or disapproval of that operation was not a prerequisite to R & H's proceeding with development operations.

In this vein, plaintiffs argue that though he had a right to do so, Burns did not object either to the substitution of R & H as operator or to the proposed workover operation prior to the blowout, yet they fail to reveal the origin of this claimed "right" to object and further fail to explain why Burns' failure to object should be a pertinent consideration. The court does not perceive the significance of this fact in view of the undisputed proof that Burns was not made aware of the change of oper-

---

**8.** Indeed, plaintiffs' response to Burns' statement of uncontested material facts states that it is reasonable to infer that a copy of the AFE was sent to Burns merely for his information. Plaintiffs apparently acknowledge, therefore, that Burns' input was irrelevant to the operations conducted by R & H.

ators until after it was a *fait accompli* and learned of the "proposed" workover only after it had already begun. And as previously stated, plaintiffs have in any event not identified the source of Burns' alleged "right" to object to either of these occurrences.[9]

Plaintiffs do not dispute that R & H contracted for or directed someone to contract for all labor and supplies for work performed at the Travis No. 3 Well, and that R & H and its contractors provided all labor and materials for the work performed at the well.[10] It is clear that Burns had no "say so" one way or the other regarding what was or was not done in connection with the well. Thus, even under the *Eagle Star* principle of entrustment of control by joint venturers, there is no basis in fact for finding that Burns "[had] an equal right of general supervision over the instrumentality [or] equal authority in directing how the instrumentality [was] to be used in the performance of the enterprise." *Eagle Star*, 134 F.2d at 758. In summary, there is nothing to indicate that Burns had a right of participation in the management or control of the operation. As a matter of law, therefore, he was not a joint venturer with R & H.

In the court's view, even had Burns ultimately elected to participate in the workover operation, that fact would not have transformed his relationship with R & H into one of joint venture since there would still have been in that situation an absence of the right of control over R & H's operations. Of course, an election by Burns to participate in the workover operation would have satisfied one facet of the *Sample* criteria, i.e., an agreement to share in the expenses and any profits of the operation. But it would not have meant that Burns had any more control of the workover. While there are no Mississippi cases which explicitly address this particular issue, the court's conclusion in this regard is amply supported by the Mississippi law relative to the necessity of right to control in a joint venture. The legion of authorities from major oil producing states which have addressed the issue are in accord.[11] *See, e.g., James v. Nico Energy Corp.*, 838 F.2d 1365, 1373 (5th Cir.1988) (no joint venture where one party's involvement in wells was limited to investment of capital and another party had sole right of control in drilling and operating of wells since mutual right of control was essential element for joint

9. Plaintiffs state that since Burns did not object and thereby allowed R & H to conduct the workover operation, he thus became obligated to contribute his proportionate share of the costs and became entitled to share in the profits. In this regard, plaintiffs are incorrect inasmuch as it is established under Mississippi law that there must be a written agreement before one can be required to share in the expense incurred in the development of mineral interests. *See supra* note 6.

10. The court notes that this is consistent with the R & H operating agreement which granted to R & H, as successor to SWEPI, "full control of all operations" and the right to select and determine the number and hours of employees, and made all employees "the employees of Operator."

11. Plaintiffs argue that where there are no Mississippi cases expressly addressing the precise issue under consideration, the court entertaining a motion to remand must resolve this "ambiguity" in favor of the nonremoving party, plaintiffs. The court is cognizant that "[a]ll ambiguities in the controlling state law are resolved in favor of the non-removing party." *Carriere*, 893

F.2d at 100 (citing *B., Inc.*, 663 F.2d at 551). That there are no Mississippi cases directly on point does not necessarily mean that there is an "ambiguity" in the law, thereby requiring the court to assume that the court would resolve the issue in plaintiffs' favor. In *Bobby Jones Garden Apartments v. Suleski*, 391 F.2d 172, 177 (5th Cir.1968), the court explained that

where there have been allegations of fraudulent joinder ... the question is whether there is arguably a reasonable basis for predicting that the state law might impose liability on the facts involved. If that possibility exists, a good faith assertion of such an expectancy in a state court is not a sham ... and is not fraudulent in fact or law.

*See also Tedder v. F.M.C. Corp.*, 590 F.2d 115 (5th Cir.1979) (affirming district court's finding of fraudulent joinder after determining as a matter of law no reasonable basis existed for predicting that plaintiff might establish liability against resident defendant). Given the clear and unambiguous Mississippi precedent requiring the mutual right of control as a prerequisite to a finding of a joint venture, the court perceives no reasonable basis for predicting that the Mississippi court would not apply that requirement in the present context.

venture under Texas law); *Blocker Exploration Co. v. Frontier Exploration, Inc.,* 740 P.2d 983, 988 (Colo.1987) (no joint venture where nonoperating working interest owner merely invested funds and enjoyed right to receive data, to elect whether to continue participation and to have access to the site where there was no right of participation in management and control of operation); *Archer v. Bill Pearl Drilling Co., Inc.,* 655 S.W.2d 338, 344 (Tex.App.1983) (no joint venture in negligence action as a matter of law where proof showed that working interest owner merely invested in venture but exercised no right to participate in control or operation of drill site); *Ayco Dev. Corp. v. G.E.T. Serv. Co.,* 616 S.W.2d 184, 186 (Tex.1981) (no joint venture where proof merely showed that defendants invested by paying costs of drilling well but did not participate in actual drilling, operation and control of the well); *Transcontinental Gas Pipe Line Corp. v. Mr. Charlie,* 294 F.Supp. 1025, 1031 (E.D.La.1968) (oil company could not recover from nonoperators where proof showed that operator, but not nonoperators, was negligent), *rev'd on other grounds,* 424 F.2d 684 (5th Cir.), *cert. denied,* 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970); *McAnally v. Cochran,* 170 Okl. 368, 46 P.2d 955, 957 (1935) (no mining partnership where exclusive control over well was with operator who never consulted coowners about employing labor and purchasing materials).[12] There being no evidence to support a joint venture, any negligence of the operator cannot be imputed to Burns on a theory of joint venture.[13]

### Agency

■ Plaintiffs argue that the negligence of the other defendant(s) may be imputed to Burns if it is shown that they were his agents. While it is true that under Mississippi law a principal is liable for the torts of his agent which are committed while the agent is acting within the scope of his agency, *Fruchter v. Lynch Oil Co.,* 522 So.2d 195, 199 (Miss.1988), the principal's right to control the acts of his agent is a precondition to the imposition of liability:

> The right to control is as important as de facto control at the tortious moment, for the right to control the work of another 'carries with it the correlative obligation to see that no tort shall be committed' by the other in the course of the work.

*Fruchter,* 522 So.2d at 199 (quoting *White's Lumber & Supply Co. v. Collins,* 186 Miss. 659, 672, 191 So. 105, 106 (1939)). Since the right of control, as discussed *supra,* is lacking here, this agency principle provides no basis for recovery against Burns.

### Strict Liability

■ Plaintiffs' complaints each contain a claim for relief against the defendants, including Burns, predicated on the doctrine of strict liability for the conduct of an abnormally dangerous activity.[14] Having

---

**12.** The court considers that its conclusion on the issue of joint venture is buttressed by the provision of the Uniform Partnership Act, adopted in Mississippi, which states that "[o]peration of a mineral property under a joint operating agreement does not of itself establish a partnership." Miss.Code Ann. § 79–12–15 (1972). A joint venture, as the court explained in *Hults,* is "for all practical purposes ... a miniature partnership," such that the same legal principles apply to both. *Hults,* 480 So.2d at 145. Here, the parties agree that there was not even a joint operating agreement in effect between Burns and R & H.

**13.** Plaintiffs suggest that whether a joint enterprise or joint venture exists is necessarily a question of fact for the jury. While it is true that the existence of a joint venture is a question of fact, whether there are sufficient inferences to support its existence is a question of law.

*Misco–United Supply, Inc. v. Petroleum Corp.,* 462 F.2d 75, 79–80 (5th Cir.1972).

**14.** The Bolivar plaintiffs alleged that

> the operations of the Well presented the opportunity for the escape of inherently dangerous natural gas and hydrogen sulfide gas. Each of the Defendants promoted and participated in the operations on the Well for profit. Each of the Defendants is strictly liable for all damages and losses resulting from the blowout and fire.

Windham and the Kennedy plaintiffs alleged that

> at the time of the blowout the well and well site were under Defendants' control. The operation and use of the Travis Well #3 Well constituted an abnormally dangerous activity. The abnormally dangerous activity or propensity could not be and was not detected and/or

reviewed the applicable Mississippi jurisprudence, the court does not consider it likely that the Mississippi Supreme Court would consider that the operations conducted by R & H were abnormally dangerous. The Mississippi court has adopted the rule of absolute or strict liability for damage caused to adjoining property by one who stores or explodes dynamite or other dangerous explosives on his land. *See Teledyne Exploration Co. v. Dickerson,* 253 So.2d 817 (Miss.1971); *Central Exploration Co., Inc. v. Gray,* 219 Miss. 757, 70 So.2d 33 (1954). But its adoption of that rule has not been extended beyond that circumstance and the Mississippi authorities have uniformly required proof of negligence against the operator of an oil or gas well as a prerequisite to the imposition of liability for damages caused to the property. *See Charles F. Hayes & Assoc., Inc. v. Blue,* 233 So.2d 127, 128 (Miss.1970); *Placid Oil Co. v. Byrd,* 217 So.2d 17, 18 (Miss. 1968); *Cities Serv. Oil Co. v. Corley,* 197 So.2d 244, 246 (Miss.1967); *see also Walters v. Inexco Oil Co.,* 511 F.Supp. 21 (S.D.Miss.1979) (applying negligence standard in action against operator by roughneck injured in explosion at oil well site). However, in the court's opinion, regardless of whether the Mississippi courts would be amenable to a finding that the reworking of a natural gas well containing hydrogen sulfide was abnormally dangerous under the circumstances presented, a finding of liability against Burns would not follow.[15] That is because "strict liability will never

be found unless the defendant is aware of the abnormally dangerous condition or activity, and has voluntarily engaged in it or permitted it." Prosser and Keeton, *The Law of Torts* § 79, at 559 (5th ed. 1984). In the case at bar, though by the time of the blowout Burns was aware that R & H had undertaken the reworking of the Travis No. 3 Well, Burns was not engaged in the operation nor is there any indication that he permitted the operation. As stated *supra,* the workover of the well by R & H would have been, and in fact, was undertaken without reference to whether or not Burns chose to participate. Moreover, as has been made clear, Burns was not in possession of the instrumentality claimed to have been abnormally dangerous nor did he have any control in connection with the reworking operation.

Premises Liability

■ Plaintiffs also maintain that they have a claim for relief against Burns based on his status as an owner and occupier of land. Windham urges that he, and the Bolivar and Kennedy plaintiffs argue that their decedents, were invitees on land owned and occupied by Burns and that Burns therefore owed them a duty, as described in *McGowan v. St. Regis Paper Co., Inc.,* 419 F.Supp. 742, 744 (S.D.Miss. 1976), to exercise reasonable care to maintain the premises in a reasonably safe condition and to warn them of dangers that were, or should have been known to Burns. Plaintiffs' argument in this regard is based

---

appreciated by the Plaintiff by the exercise or reasonable diligence. The abnormally dangerous activity was a producing cause of Plaintiff's damages, for which the Defendants are responsible to Plaintiff under the doctrine of strict liability.

**15.** In *Sprankle v. Bower Ammonia & Chemical Co.,* 824 F.2d 409, 415 n. 6 (5th Cir.1987), the Fifth Circuit stated that "whether an activity is an abnormally dangerous one is a question of law to be determined by the court, at least to the extent that *the determination does not depend on a resolution of conflicting evidence on specific, historic facts."* Defendants in this case have presented evidence, uncontroverted by plaintiffs, that workover operations are performed safely every day in the oil and gas industry, and that pulling pipe out of the hole so that certain wireline tools and equipment can

be removed is a routine occurrence in the industry. If proper equipment and devices are used, this operation can be safely performed. They have presented proof that hydrogen sulfide gas can be detected by the senses and only becomes lethal at a certain level, and that there exist detection systems to alert individuals in the area of the well to the presence of the gas. And there are devices to prevent the release of hydrogen sulfide and other gases, which, if properly used and in proper working order, should eliminate the possibility of release of gas from the well. These facts tend to establish that the activity in question was not abnormally dangerous. *See Restatement (Second) of Torts* §§ 519–520 (1977) (setting forth standards for determining whether activity is abnormally dangerous or ultrahazardous).

on statements in a number of Mississippi cases to the effect that a working interest in an oil well is an interest in realty. *Chevron Oil Co. v. Clark*, 432 F.2d 280, 286 (5th Cir.1970); *Martin v. Humble Oil & Refining Co.*, 199 F.Supp. 648 (S.D.Miss.1960), *aff'd*, 298 F.2d 163 (5th Cir.1961). Merely because Burns owned an interest in realty, however, does not make him an owner of the realty so as to give rise to liability for injuries occurring thereon. Ownership of minerals is separate from the ownership of the land. Accordingly, Burns can have no liability to plaintiffs on the premises liability espoused by plaintiffs.

### Conclusion

 Based on the foregoing, it is ordered that plaintiffs' motions to remand are denied. It is further ordered that Burns' motion for summary judgment is granted. *See Carriere*, 893 F.2d at 102 (summary judgment always appropriate in favor of defendant against whom there is no possibility of recovery).